# UNITED DOMINION INDUSTRIES, INC. *v.* UNITED STATES

No. 00–157.   Argued March 26, 2001—Decided June 4, 2001

824

*Eric R. Fox* argued the cause for petitioner. With him on the briefs was *Alan J. J. Swirski.*

*Kent L. Jones* argued the cause for the United States. With him on the brief were *Acting Solicitor General Underwood, Deputy Assistant Attorney General Fallon, Deputy Solicitor General Wallace, Richard Farber,* and *Edward T. Perelmuter.**

JUSTICE SOUTER delivered the opinion of the Court.

Under § 172(b)(1)(I) of the Internal Revenue Code of 1954, a taxpayer may carry back its "product liability loss" up to 10 years in order to offset prior years' income. The issue here is the method for calculating the product liability loss of an affiliated group of corporations electing to file a consolidated federal income tax return. We hold that the group's product liability loss must be figured on a consolidated basis in the first instance, and not by aggregating product liability losses separately determined company by company.

---

*Richard E. Zuckerman* and *Raymond M. Kethledge* filed a brief for the National Association of Manufacturers et al. as *amici curiae* urging reversal.

I

A "net operating loss" results from deductions in excess of gross income for a given year. 26 U. S. C. § 172(c).[1]  Under § 172(b)(1)(A), a taxpayer may carry its net operating loss either backward to past tax years or forward to future tax years in order to "set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year," *Libson Shops, Inc.* v. *Koehler*, 353 U. S. 382, 386 (1957).

Although the normal carryback period was at the time three years, in 1978, Congress authorized a special 10-year carryback for "product liability loss[es]," 26 U. S. C. § 172(b)(1)(I), since, it understood, losses of this sort tend to be particularly "large and sporadic."  Joint Committee on Taxation, General Explanation of the Revenue Act of 1978, 95th Cong., 232 (Comm. Print 1979).  The Code defines "product liability loss," for a given tax year, as the lesser of (1) the taxpayer's "net operating loss for such year" and (2) its allowable deductions attributable to product liability "expenses."  26 U. S. C. § 172(j)(1).  In other words, a taxpayer's product liability loss (PLL) is the total of its product liability expenses (PLEs), limited to the amount of its net operating loss (NOL).  By definition, then, a taxpayer with positive annual income, and thus no NOL, may have PLEs but can have no PLL.[2]

---

[1] Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954, 26 U. S. C. § 1 *et seq.* (1982 ed. and Supp. V), as in effect between 1983 and 1986, the tax years here in question.

[2] If, for example, a company had $100 in taxable income, $50 in deductible PLEs, and $75 in additional deductions, its NOL would be $25 (*i. e.,* $100−$50−$75= −$25); it could count only $25 of its $50 in PLEs as PLL.  If the company had $100 in income, $50 in PLEs, and $125 in additional deductions, its NOL would be $75, and it could count its entire $50 in PLEs as PLL.  And, finally, if the company had $100 in income, $50 in PLEs, and $40 in additional deductions, it would have positive income and, thus, no NOL and no PLL.

Instead of requiring each member company of "[a]n affiliated group of corporations" to file a separate tax return, the Code permits the group to file a single consolidated return, 26 U. S. C. § 1501, and leaves it to the Secretary of the Treasury to work out the details by promulgating regulations governing such returns, § 1502. Under Treas. Regs. §§ 1.1502–11(a) and 1.1502–21(f),[3] an affiliated group's "consolidated taxable income" (CTI), or, alternatively, its "consolidated net operating loss" (CNOL), is determined by "taking into account" several items. The first is the "separate taxable income" (STI) of each group member. A member's STI (whether positive or negative) is computed as though the member were a separate corporation (*i. e.*, by netting income and expenses), but subject to several important "modifications." Treas. Reg. § 1.1502–12. These modifications require a group member calculating its STI to disregard, among other items, its capital gains and losses, charitable-contribution deductions, and dividends-received deductions. *Ibid.* These excluded items are accounted for on a consolidated basis, that is, they are combined at the level of the group filing the single return, where deductions otherwise attributable to one member (say, for a charitable contribution) can offset income received by another (from a capital gain, for example). Treas. Regs. §§ 1.1502–11(a)(3) to (8); 1.1502–21(f)(2) to (6). A consolidated group's CTI or CNOL, therefore, is the sum of each member's STI, plus or minus a handful of items considered on a consolidated basis.

## II

Petitioner United Dominion's predecessor in interest, AMCA International Corporation, was the parent of an affiliated group of corporations that properly elected to file

---

[3] Unless otherwise noted, Treasury Regulation references are to the regulations in effect between 1983 and 1986, 26 CFR § 1.1502–11 *et seq.* (1982–1986).

consolidated tax returns for the years 1983 through 1986. In each of these years, AMCA reported CNOL (the lowest being $85 million and the highest, $140 million) that exceeded the aggregate of its 26 individual members' PLEs ($3.5 million to $6.5 million). This case focuses on the PLEs of five of AMCA's member companies, which, together, generated roughly $205,000 in PLEs in 1983, $1.6 million in 1984, $1.3 million in 1985, and $250,000 in 1986. No one disputes these amounts or their characterization as PLEs. See 208 F. 3d 452, 453 (CA4 2000) ("The parties agree" with respect to the amount of "the product liability expenses incurred by the five group members in the relevant years"). Rather, the sole question here is whether the AMCA affiliated group may include these amounts on its consolidated return, in determining its PLL for 10-year carryback. The question arises because of the further undisputed fact that in each of the relevant tax years, each of the five companies in question (with minor exceptions not relevant here), reported a positive STI.

AMCA answered this question by following what commentators have called a "single-entity" approach[4] to calculating its "consolidated" PLL. For each tax year, AMCA (1) calculated its CNOL pursuant to Treas. Reg. § 1.1502–11(a), and (2) aggregated its individual members' PLEs. Because, as noted above, for each tax year AMCA's CNOL was greater than the sum of its members' PLEs, AMCA treated the full amount of the PLEs as consolidated PLL eligible for 10-year carryback. In AMCA's view, the fact that several member companies throwing off large PLEs also, when considered separately, generated positive taxable income was of no significance.

From the Government's perspective, however, the fact that the several affiliated members with PLEs also gen-

---

[4] Axelrod & Blank, The Supreme Court, Consolidated Returns, and 10-Year Carrybacks, 90 Tax Notes, No. 10, p. 1383 (Mar. 5, 2001) (hereinafter Axelrod & Blank).

erated positive separate taxable income is of critical significance. According to the Government's methodology, which we will call the "separate-member" approach,[5] PLEs incurred by an affiliate with positive separate taxable income cannot contribute to a PLL eligible for 10-year carryback. Whereas AMCA compares the group's total income (or loss) and total PLEs in an effort to determine the group's total PLL, the Government compares each affiliate's STI and PLEs in order to determine whether each affiliate suffers a PLL, and only then combines any PLLs of the individual affiliates to determine a consolidated PLL amount.

In 1986 and 1987, AMCA petitioned the Internal Revenue Service for refunds of taxes based on its PLL calculations. The IRS first ruled in AMCA's favor but was reversed by the Joint Committee on Internal Revenue Taxation of the United States Congress, which controls refunds exceeding a certain threshold, 26 U. S. C. §6405(a). AMCA then filed this refund action in the United States District Court for the Western District of North Carolina. The District Court agreed with AMCA that an affiliated group's PLL is determined on a single-entity basis, and held that, so long as the group's consolidated return reflects CNOL in excess of the group's aggregate PLEs, the total of those expenses (including those incurred by members with positive separate taxable income) is a PLL that "may be carried back the full ten years." No. 3:95-CV-341-MU (June 19, 1998), App. to Pet. for Cert. 39a. The United States Court of Appeals for the Fourth Circuit reversed, and held that "determining 'product liability loss' separately for each group member is correct and consistent with [Treasury] regulations." 208 F. 3d, at 458.

Because the Fourth Circuit's separate-member approach to calculating PLL conflicted with the Sixth Circuit's adoption of the single-entity approach in *Intermet Corp.* v. *Com-*

---

[5] *Ibid.*

*missioner*, 209 F. 3d 901 (2000), we granted certiorari, 531 U. S. 1009 (2000).[6]   We now reverse.

## III

The case for the single-entity approach to calculating an affiliated group's PLL is straightforward.   Section 172(j)(1) defines a taxpayer's "product liability loss" for a given tax year as the lesser of its "net operating loss for such year" and its product liability "expenses."   In order to apply this definition, the taxpayer first determines whether it has taxable income or NOL, and in making that calculation it subtracts PLEs.   If the result is NOL, the taxpayer then makes a simple comparison between the NOL figure and the total PLEs.   The PLE total becomes the PLL to the extent it does not exceed NOL.   That is, until NOL has been determined, there is no PLL.

The first step in applying the definition and methodology of PLL to a taxpayer filing a consolidated return thus requires the calculation of NOL.   As United Dominion correctly points out, the Code and regulations governing affiliated groups of corporations filing consolidated returns provide only one definition of NOL: "consolidated" NOL, see Treas. Reg. § 1.1502–21(f).   There is no definition of separate NOL for a member of an affiliated group.   Indeed, the fact that Treasury Regulations do provide a measure of separate NOL in a different context, for an affiliated corporation as to any year in which it filed a separate return, *infra*, at 832–834, underscores the absence of such a measure for an affili-

---

[6] *Intermet* involved "specified liability losses" (SLLs), not PLLs.   The difference, however, does not matter.   The PLL was a statutory predecessor to the SLL, and PLLs were folded into the SLL provision in § 11811(b)(1) of the Omnibus Budget Reconciliation Act of 1990, 104 Stat. 1388–532.   Thus, "[i]n all relevant respects, the provisions on [PLLs] and SLLs are the same."   Leatherman, Current Developments for Consolidated Groups, 486 PLI/Tax 389, 393, n. 5 (2000) (hereinafter Leatherman, Current Developments).

ated corporation filing as a group member. Given this apparently exclusive definition of NOL as CNOL in the instance of affiliated entities with a consolidated return (and for reasons developed below, *infra,* at 834–838) we think it is fair to say, as United Dominion says, that the concept of separate NOL "simply does not exist." Brief for Petitioner 15.[7] The exclusiveness of NOL at the consolidated level as CNOL is important here for the following reasons. The Code's authorization of consolidated group treatment contains no indication that for a consolidated group the essential relationship between NOL and PLL will differ from their relationship for a conventional corporate taxpayer. Nor does any Treasury Regulation purport to change the relationship in the consolidated context. If, then, the relationship is to remain essentially the same, the key to understanding it lies in the regulations' definition of net operating loss exclusively at the consolidated level. Working back from that, PLEs should be considered first in calculating CNOL, and they are: because any PLE of an affiliate affects the calculation of its STI, that same PLE necessarily affects the CTI or CNOL in exactly the same way, dollar for dollar. And because, by definition, there is no NOL measure for a consolidated return group or any affiliate except CNOL, PLEs cannot be compared with any NOL to produce PLL until CNOL has been calculated. Then, and only then in the case of the consolidated filer, can total PLEs be compared

---

[7] In addition to Treas. Reg. § 1.1502–79(a)(3), discussed *infra,* at 832–834, two other provisions, 26 U. S. C. § 1503(f)(2) and the current version (though not the version applicable between 1983 and 1986) of Treas. Reg. § 1502–21(b) (2000), refer to separate group members' NOLs. The parties here have not emphasized those provisions, and with good reason. Not only are they inapplicable to the question before us (either substantively, temporally, or both), but, as one commentator has observed, their references to separate NOLs "ste[m] more from careless drafting than meaningful design." Leatherman, *Are Separate Liability Losses Separate for Consolidated Groups?,* 52 Tax. Law. 663, 705 (1999) (hereinafter Leatherman, Separate Liability Losses).

with a net operating loss. In sum, comparable treatment of PLL in the instances of the usual corporate taxpayer and group filing a consolidated return can be achieved only if the comparison of PLEs with a limiting loss amount occurs at the consolidated level after CNOL has been determined. This approach resting on comparable treatment has a further virtue entitled to some weight in case of doubt: it is (relatively) easy to understand and to apply.

The case for the separate-member approach, advanced (in one variant) by the Government and adopted (on a different rationale) by the Court of Appeals, is not so easily made. In the analysis of comparable treatment just set out, of course, there is no NOL below the consolidated level and hence nothing for comparison with PLEs to produce PLL at any stage before the CNOL calculation. At the least, then, a proponent of the separate-member approach must identify some figure in the consolidated return scheme that could have a plausible analogy to NOL at the level of the affiliated corporations. See A. Dubroff, J. Blanchard, J. Broadbent, & K. Duvall, Federal Income Taxation of Corporations Filing Consolidated Returns § 41.04[06], p. 41–75 (2d ed. 2000) (hereinafter Dubroff) ("Even if separate entity treatment was appropriate, it is unclear how a member with [PLEs] would compute its separate NOL"). The Government and the Court of Appeals have suggested different substitute measures. Neither one works.

The Government has argued that an individual group member's STI, as determined under Treas. Reg. § 1.1502–12, is analogous to a "separate" NOL, so that an affiliate's STI may be compared with its PLEs in order to determine any separate PLL. An individual member's PLL would be the amount of its separate PLEs up to the amount of its negative STI; a member having positive STI could have no PLL.

The Government claims that an STI-based comparison places the group member closest to the position it would have occupied if it had filed a separate return. But that

is simply not so. We have seen already that the calculation of a group member's STI by definition excludes several items that an individual taxpayer would normally account for in computing income or loss, but which an affiliated group may tally only at the consolidated level, such as capital gains and losses, charitable-contribution deductions, and dividends-received deductions. Treas. Regs. §§ 1.1502–12(j) to (n). Owing to these exclusions, an affiliate's STI will tend to be inflated by eliminating deductions it would have taken if it had filed separately, or deflated by eliminating an income item like capital gain.

When pushed, the Government concedes that STI is "not necessarily equivalent to the income or [NOL] figure that the corporation would have computed if it had filed a separate return." Brief for United States 21, n. 14. But, the Government claims, "[t]here has never been a taxpayer with [PLEs] who had a positive [STI] but a negative separate [NOL]." Tr. of Oral Arg. 27. In other words, the Government says that the deductions excluded from STI have never once made a difference and, therefore, that STI is, in fact, a decent enough proxy for a group member's "separate" NOL. But whether or not the excluded items have made a difference in the past, or make a difference here, they certainly could make a difference and, given the potential importance of some of the deductions involved (a large charitable contribution, for example), it is not hard to see how the difference could favor the Government.

The Court of Appeals was therefore right to reject the Government's reliance on STI as a functional surrogate for an affiliate's "separate" NOL. 208 F. 3d, at 459–460. But what the Court of Appeals used in place of STI fares no better. The court relied on Treas. Reg. § 1.1502–79, which contains a definition of "separate net operating loss" that the court believed to be "analogous to an individual's 'net operating loss' on a separate return." 208 F. 3d, at 460. Section 1.1502–79(a)(3) provides that, "[f]or purposes of this

subparagraph," the "separate net operating loss of a member of the group shall be determined under § 1.1502–12 . . . , adjusted for the . . . items taken into account in the computation of" the CNOL. As the Court of Appeals said, the directive of § 1.1502–79(a)(3) (unlike the definition of STI) "takes into account, for example, [a] member's charitable contributions" and other consolidated deductions. 208 F. 3d, at 460–461.

But this sounds too good. It is true that, insofar as § 1.1502–79(a)(3) accounts for gains and losses that STI does not, it gets closer to a commonsense notion of a group member's "separate" NOL than STI does. But the fact that § 1.1502–79(a)(3) improves on STI simply by undoing what § 1.1502–12 requires in defining STI is suspicious, and the suspicion turns out to be justified. Section 1.1502–79(a)(3) unbakes the cake for only one reason, and that reason has no application here. The definition on which the Court of Appeals relied applies, by its terms, only "for purposes of" § 1.1502–79(a)(3), and context makes clear that the purpose is to provide a way to allocate CNOL to an affiliate member that seeks to carry back a loss to a "separate return year," that is, to a year in which the member was not part of the consolidated group. See Treas. Reg. § 1.1502–79 (titled "Separate return years"); § 1.1502–79(a) (titled "Carryover and carryback of [CNOL] to separate return years"); § 1.1502–79(a)(1) ("[i]f a [CNOL] can be carried . . . to a separate return year . . ."). No separate return years are at issue before us; all NOL carrybacks relevant here apply to years in which the five corporations were affiliated in the group. The Court of Appeals thus applied concepts addressing separate return years to a determination for a consolidated return year, without any statutory or regulatory basis for doing so. Cf. 49 Fed. Reg. 30530 (1984) ("[A]lthough the consolidated net operating loss is apportioned to individual members for purposes of carry backs to separate return years [under § 1.1502–79(a)], the apportioned amounts are not

separate NOLs of each member"). Hence, while § 1.1502–79 might not distort an affiliate's separate NOL in the same way that STI does, the facial inapplicability of that regulation only underscores the exclusive concern of § 1.1502–11(a) with consolidated NOL.

In sum, neither method for computing PLL on a separate-member basis squares with the notion of comparability as applied to consolidated return regulations. On the contrary, by expressly and exclusively defining NOL as CNOL, the regulations support the position that group members' PLEs should be aggregated and the affiliated group's PLL determined on a consolidated, single-entity basis.

## IV

Several objections have been raised to a single-entity approach to calculating PLL that we have not considered yet. First, the Government insists that a single-entity rule allows affiliated groups a "double deduction." . The Government argues that because PLEs are not included among the specific items (charitable-contribution deductions, etc.) for which consolidated, single-entity treatment is required under Treas. Reg. § 1.1502–12, PLEs are "consumed" or "used up" in computing members' STIs, which, pursuant to Treas. Regs. §§ 1.1502–11(a) and 1.1502–21(f), are then used to calculate the group's CTI or CNOL. According to the Government, to permit the use of PLEs first to reduce an individual member's STI and then to contribute to an aggregate PLL for carryback purposes would be tantamount to a double deduction.

The double-deduction argument may have superficial appeal, but any appeal it has rests on a fundamental misconception of the function of STI in computing an affiliated group's tax liability. Calculation of a group member's STI is not in and of itself the basis for any tax event, and there is no separate tax saving when STI is calculated; that occurs only when deductions on the consolidated return equal in-

come and (if they exceed income and produce a CNOL) are carried back against prior income. STI is merely an accounting construct devised as an interim step in computing a group's CTI or CNOL; it "has no other purpose." *Intermet,* 209 F. 3d, at 906 ("A member's STI is simply a step along the way to calculating the group's taxable income or CNOL"). The fact that a group member's PLEs reduce its STI, which in turn either reduces the group's CTI or contributes to its CNOL "dollar for dollar," *ibid.,* is of no other moment.[8] If there were anything wrong in what United Dominion proposes to do, it would be wrong in relation to CNOL and its use for any carryback. Yet, as noted above, no one here disputes that the group members had PLEs in the total amount claimed or that the AMCA group is entitled to carry back the full amount of its CNOL to offset income in prior years. The only question is what portion, if any, of AMCA's CNOL is PLL and, as such, eligible for 10-year, as opposed to 3-year, carryback treatment. There is no more of a double deduction with a 10-year carryback than one for three years.

A second objection was the reason that the Court of Appeals rejected the single-entity approach. That court attached dispositive significance to the fact that, while the Treasury Regulation we have discussed, § 1.1502–12, specifically provides that several items (capital gains and losses, charitable-contribution deductions, etc.) shall be accounted for on a consolidated basis, it does not similarly provide for accounting for PLEs on a consolidated basis: "The regulations provide for blending the group members' [NOLs],

---

[8] It makes no difference whatsoever whether the affiliate's PLEs are (1) first netted against each member's income and then aggregated or (2) first aggregated and then netted against the group's combined income: under either method, AMCA's CNOL is the same. See Axelrod & Blank 1394 (noting that this conclusion follows from "the associative principle of arithmetic (which holds that the groupings of items in the case of addition and subtraction have no effect on the result)").

and they explicitly define [CNOL] without an accompanying reference to consolidated [PLEs].  This omission . . . makes clear that blending those expenses is not permitted . . . ." 208 F. 3d, at 458.

We think the omission of PLEs from the series of items that § 1.1502–12 requires to be tallied at the consolidated level has no such clear lesson, however.  The logic that invests the omission with significance is familiar: the mention of some implies the exclusion of others not mentioned. *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U. S. 163, 168 (1993) *("Expressio unius est exclusio alterius").*  But here, as always, the soundness of that premise is a function of timing: if there was a good reason to consider the treatment of consolidated PLL at the time the regulation was drawn, then omitting PLL from the list of items for consolidated treatment may well have meant something.  But if there was no reason to consider PLL then, its omission would mean nothing at all.  And in fact there was no reason.  When the consolidated return regulations were first promulgated in 1966, there was no carryback provision pegged to PLEs or PLLs; those notions did not become separate carryback items until 1978, when the 10-year rule was devised.  See Revenue Act of 1978, § 371, 92 Stat. 2859; see also Leatherman, Current Developments 393, n. 5.  Omission of PLEs or PLLs from the series set out for consolidated treatment in the 1966 regulation therefore meant absolutely nothing in 1966.  The issue, then, is the significance, not of omission, but of failure to include later: has the significance of the earlier regulation changed solely because the Treasury has never amended it, even though PLL is now a separate carryback?  We think that is unlikely.  The Treasury's relaxed approach to amending its regulations to track Code changes is well documented.  See *e. g.,* Dubroff 41–72, n. 193; Axelrod & Blank 1391; Leatherman, Separate Liability Losses 708–709.  The absence of any amendment to § 1.1502–12 that might have added PLEs

or PLLs to the list of items for mandatory single-entity treatment therefore is more likely a reflection of the Treasury's inattention than any affirmative intention on its part to say anything at all.

Last, the Government warns that "[t]he rule that petitioner advocates would permit significant tax avoidance abuses." Brief for United States 40. Specifically:

> "Under petitioner's approach, a corporation that is currently unprofitable but that had substantial income in prior years could (i) acquire a profitable corporation with product liability expense deductions in the year of acquisition, (ii) file a consolidated return and (iii) thereby create an otherwise nonexistent 'product liability loss' for the new affiliated group that would allow the acquiring corporation to claim refunds of the tax it paid in prior years." *Ibid.*

The Government suggests, for example, that "a manufacturing company (with prior profits and current losses) that has no product liability exposure could purchase a tobacco company (with both prior and current profits) that has significant product liability expenses" and that "[t]he combined entity could . . . assert a ten-year carryback of 'product liability losses' even though the tobacco company has always made a profit and never incurred a 'loss' of any type." *Id.,* at 40–41, n. 27.

There are several answers. First, on the score of tax avoidance, the separate-member approach is no better (and is perhaps worse) than the single-entity treatment; both entail some risk of tax-motivated behavior. See Leatherman, Separate Liability Losses 681 (Under the separate-member approach, "[d]espite sound non-tax business reasons, a group may be disinclined to form a new member or transfer assets between members, because it may worry that it would lose the benefit of a ten-year carryback," and "may be encouraged to transfer assets between members to increase its consoli-

dated [PLL], even when those transfers would otherwise be ill-advised"). Second, the Government may, as always, address tax-motivated behavior under Internal Revenue Code § 269, which gives the Secretary ample authority to "disallow [any] deduction, credit, or other allowance" that results from a transaction "the principal purpose [of] which . . . is evasion or avoidance of Federal income tax." 26 U. S. C. § 269(a). And finally, if the Government were to conclude that § 269 provided too little protection and that it simply could not live with the single-entity approach, the Treasury could exercise the authority provided by the Code, 26 U. S. C. § 1502, and amend the consolidated return regulations.

* * *

Thus, it is true, as the Government has argued, that "[t]he Internal Revenue Code vests ample authority in the Treasury to adopt consolidated return regulations to effect a binding resolution of the question presented in this case." Brief for United States 19–20. To the extent that the Government has exercised that authority, its actions point to the single-entity approach as the better answer. To the extent the Government disagrees, it may amend its regulations to provide for a different one.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, concurring.

I agree with the Court that the Internal Revenue Code provision and the corresponding Treasury Regulations that control consolidated filings are best interpreted as requiring a single-entity approach in calculating product liability loss. I write separately, however, because I respectfully disagree with the dissent's suggestion that, when a provision of the

Code and the corresponding regulations are ambiguous, this Court should defer to the Government's interpretation. See *post* this page (opinion of STEVENS, J.). At a bare minimum, in cases such as this one, in which the complex statutory and regulatory scheme lends itself to any number of interpretations, we should be inclined to rely on the traditional canon that construes revenue-raising laws against their drafter. See *Leavell* v. *Blades,* 237 Mo. 695, 700–701, 141 S. W. 893, 894 (1911) ("When the tax gatherer puts his finger on the citizen, he must also put his finger on the law permitting it"); *United States* v. *Merriam,* 263 U. S. 179, 188 (1923) ("If the words are doubtful, the doubt must be resolved against the Government and in favor of the taxpayer"); *Bowers* v. *New York & Albany Lighterage Co.,* 273 U. S. 346, 350 (1927) ("The provision is part of a taxing statute; and such laws are to be interpreted liberally in favor of the taxpayers"). Accord, *American Net & Twine Co.* v. *Worthington,* 141 U. S. 468, 474 (1891); *Benziger* v. *United States,* 192 U. S. 38, 55 (1904).

JUSTICE STEVENS, dissenting.

This is a close and difficult case, in which neither the statute nor the regulations offer a definitive answer to the crucial textual question. Absent a clear textual anchor, I would credit the Secretary of the Treasury's concerns about the potential for abuse created by the petitioner's reading of the statutory scheme and affirm the decision of the Court of Appeals on that basis.[1]

---

[1] JUSTICE THOMAS accurately points to a tradition of cases construing "revenue-raising laws" against their drafter. See *ante* this page (THOMAS, J., concurring). However, when the ambiguous provision in question is not one that imposes tax liability but rather one that crafts an exception from a general revenue duty for the benefit of some taxpayers, a countervailing tradition suggests that the ambiguity should be resolved in the government's favor. See, *e. g., INDOPCO, Inc.* v. *Commissioner,* 503 U. S. 79, 84 (1992); *Interstate Transit Lines* v. *Commissioner,*

As the majority accurately reports, during the time relevant to this case, § 172(b)(1)(I) of the Internal Revenue Code of 1954 allowed any "taxpayer" who "ha[d] a product liability loss" to carry back its excess product liability losses for 10 years. The resolution of this case turns on whether, when a group of affiliated corporations files a consolidated tax return, the entire group should be considered the "taxpayer" for the purposes of implementing this provision or whether each individual corporation should be seen as a "taxpayer."

There is no obvious answer to this question. On the one hand, it is generally accepted that the rationale behind the consolidated return regulations is to allow affiliated corporations that are run as a single entity to elect to be treated for tax purposes as a single entity. See, e. g., Brief for Petitioner 17–19 (collecting sources in which the Internal Revenue Service so stated). On the other hand, it is quite clear that each corporation in such a group remains in both a legal and a literal sense a "taxpayer," a status that has important consequences. See Woolford Realty Co. v. Rose, 286 U. S. 319, 328 (1932) ("The fact is not to be ignored that each of two or more corporations joining . . . in a consolidated return is none the less a taxpayer"); 26 U. S. C. § 7701(a)(14) (defining a "taxpayer" as "any person subject to any internal revenue tax," where a related provision defines "person" to include corporations). As both the group and the individual corporations are considered "taxpayers" in different contexts, the statute presents a genuine ambiguity.

When a provision of the Internal Revenue Code presents a patent ambiguity, Congress, the courts, and the IRS share a preference for resolving the ambiguity via executive action. See, e. g., National Muffler Dealers Assn., Inc. v. United States, 440 U. S. 472, 477 (1979). This is best

319 U. S. 590, 593 (1943); Deputy, Administratrix v. Du Pont, 308 U. S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U. S. 435, 440 (1934); Woolford Realty Co. v. Rose, 286 U. S. 319, 326 (1932).

achieved by the issuing of a Treasury Regulation resolving the ambiguity. *Ibid.* In this instance, however, the Secretary of the Treasury issued no such regulation. In the absence of such a regulation, the majority has scoured tangentially related regulations, looking for clues to what the Secretary might intend. For want of a more precise basis for resolving this case, that approach is sound.

It is at this point, however, that I part company with the majority's analysis. The fact that the regulations forward a particular method for calculating a consolidated "net operating loss" (NOL) for a group of affiliated companies, see Treas. Reg. § 1.1502–21(f), tells us how the Secretary wants the NOL to be calculated whenever it is necessary to determine a consolidated NOL, but it does not tell us what provisions of the Code require the calculation of a consolidated NOL. That is a separate and prior question. Even if we were to draw some mild significance from the presence of such a regulation (and the absence, at the time these returns were filed, of a similar regulation for the calculation of corporation-specific NOL's), the power of that inference is counterbalanced by the fact that the regulations listing deductions that must be reported at the consolidated level makes no mention of product liability expenses. See Treas. Reg. § 1.1502–12; see also *H. Enterprises Int'l, Inc.* v. *Commisioner,* 105 T. C. 71, 85 (1995) (construing Treas. Reg. § 1.1502–80(a) to provide "[w]here the consolidated return regulations do not require that corporations filing such returns be treated differently from the way separate entities would be treated, those corporations shall be treated as separate entities when applying provisions of the Code"). In addition, the subsequent promulgation of a method for calculating a corporation-specific NOL (albeit for a different purpose), see § 1.1502–79(a)(3) (defining "separate net operating loss"), demonstrates that there are no inherent problems implicit in undertaking such a calculation.

In short, I find no answer to this case in the text of the statute or in any Treasury Regulation.[2]  However, the Government does forward a valid policy concern that militates against petitioner's construction of the statute: the fear of tax abuse.  See Brief for United States 40–42.  Put simply, the Government fears that currently unprofitable but previously profitable corporations might receive a substantial windfall simply by acquiring a corporation with significant product liability expenses but no product liability losses.  See *id.*, at 40.  On a subjective level, I find these concerns troubling.  Cf. *Woolford Realty Co.*, 286 U. S., at 330 (rejecting "the notion that Congress in permitting a consolidated return was willing to foster an opportunity for juggling so facile and so obvious").  More importantly, however, I credit the Secretary of the Treasury's concerns about the potential scope of abuse.  Perhaps the Court is correct in suggesting that these concerns can be alleviated through applications of other anti-abuse provisions of the Tax Code, see *ante*, at 838, but I am not persuaded of my own ability to make that judgment.  When we deal "with a subject that is highly specialized and so complex as to be the despair of judges," *Dobson* v. *Commissioner*, 320 U. S. 489, 498 (1943), an ounce of deference is appropriate.

I respectfully dissent.[3]

---

[2] I am also in full agreement with the Court's rejection of the Government's double-deduction argument.  See *ante*, at 834–835.

[3] Because I agree with the majority that the calculation contemplated by Treas. Reg. § 1.1502–79(a)(3) better approximates the NOL that each company would have had reported if filing individually than the alternative forwarded by the Government, see *ante*, at 833, I agree with the Court of Appeals' decision to adopt that measure and would affirm the decision below in its entirety.