IKUTA, Circuit Judge,
concurring and dissenting:
I concur in the majority’s holding that the Fair Housing Act (FHA) does not apply to the sharing of living units. I write separately, however, to express my concern that our circuit’s test for organizational standing cannot be reconciled with Supreme Court precedent. Further, I respectfully dissent from Part IV of the majority decision, which applies its FHA analysis to the California Fair Employment and Housing Act (FEHA) claim of the two Fair Housing Councils.
I
In order to assert standing as an organization, rather than on behalf of their members,[1] the Fair Housing Councils must show they suffered an injury in fact, just as if they were individuals. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In other words, each Fair Housing Council must show that Roommate’s actions caused it to suffer “an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted).[2] To meet this requirement, the Fair Housing Councils must show that Roommate’s conduct “perceptibly impair[s]” the organizations’ interest in carrying out their core missions. Havens, 455 U.S. at 378-79, 102 S.Ct. 1114.
Fair Housing Councils of San Fernando Valley and San Diego are non-profit organizations with the shared core mission of ehminating housing discrimination in their communities. They accomplish this mission through, among other things, investigation, education, and outreach regarding instances of housing discrimination. In response to their discovery of Roommate’s allegedly discriminatory housing advertisements, the Fair Housing Councils spent money on investigation, education, and outreach regarding the trend of housing discrimination on the Internet.
So far so good: two organizations dedicated to combating housing discrimination have spent money combating housing discrimination. But according to the Fair Housing Councils and our precedent, these organizations were “injured” for standing purposes by the very expenses that advanced their mission. This raises a question that threatens to bring us loggerheads with Lujan: How can an organization have a legally protected interest in not spending money to advance its core mission?
A
The answer to this question is embedded in an illogical and erroneous development in our case law. We have correctly recognized that organizations have standing to sue on their own behalf when a *1225 defendant’s actions impair the organization’s ability to function as an organization. An action that invades an organization’s interest in recruiting members, obtaining funding, or collecting dues clearly hinders that organization’s ability to function, and is an injury for purposes of standing. See, e.g., Am. Fed’n. of Gov’t Emps. Local 1 v. Stone, 502 F.Sd 1027, 1033 (9th Cir.2007) (“[A]n increased difficulty in recruiting union members qualifies as a ‘concrete and demonstrable’ injury”); Walker v. City of Lakewood, 272 F.3d 1114, 1124-25 (9th Cir.2001) (holding that an organization was injured by, among other things, delayed contractual payments and government client’s non-renewal of the contract); Constr. Indus. Ass’n of Sonoma Cty. v. City of Petaluma, 522 F.2d 897, 903 (9th Cir.1975) (holding that a restrictive building plan injured an association of builders “in a very real sense” because it decreased construction and consequently, membership dues for the association).
The Supreme Court has also held that an organization’s ability to function as an organization is impaired if its purpose is to provide a specified type of service and a defendant’s actions hinder the organization from providing that core service. Havens, 455 U.S. at 378-79, 102 S.Ct. 1114. In Havens, a fair housing organization alleged that its mission was to “assist equal access to housing through counseling and other referral services.” Id. at 379, 102 S.Ct. 1114. The organization asserted that the defendant’s discriminatory housing practices frustrated the organization’s ability to “provide counseling and referral services for low- and moderate-income home-seekers.” Id. The Court held that this allegation was sufficient for standing because it represented a “concrete and demonstrable injury to the organization’s activities — with the consequent drain on the organizations’s resources — [that was] far more than simply a setback to the organization’s abstract social interests.” Id.
Based on this language in Havens, we developed a two-prong test: an organization can establish an injury if it can show “(1) frustration of its organizational mission; and (2) diversion of its resources to combat the [challenged actions].” Smith v. Pac. Prop. & Dev. Corp., 358 F.3d 1097, 1105 (9th Cir.2004). While our articulation of the test is consistent with Havens, our application of it has drifted away from the requirement that an organization actually suffer an injury.
In Smith, for example, we considered whether an organization dedicated to “eliminatfing] discrimination against individuals with disabilities by ensuring compliance with [accessibility] laws” had standing to sue a real estate developer who constructed properties with alleged design and construction defects that violated those laws. Id. at 1105. We held that because the organization’s ultimate goal was to eliminate discrimination against individuals with disabilities, “[a]ny violation” of the relevant accessibility law constituted a frustration of the organization’s mission. Id.; see also Fair Hous. of Marin v. Combs, 285 F.3d 899, 905 (9th Cir.2002) (holding that an organization’s mission of promoting equal housing opportunities, as required by the FHA, was frustrated by the defendant’s alleged FHA violations). We further held that the organization met the “diversion of resources” prong because the money it spent “in order to monitor the violations” diverted resources “from other efforts to promote awareness of— and compliance with — federal and state accessibility laws.” Smith, 358 F.3d at 1105. Yet no allegations were made that this allocation of resources harmed the organization in any way. Id. Rather, all that our precedent required for diversion was that the organization spent resources that it *1226 “otherwise would spend in other ways.” El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review, 959 F.2d 742, 748 (9th Cir.1991).
Thus, we have held that an organization with a social interest in advancing enforcement of a law was injured when the organization spent money enforcing that law. This looks suspiciously like a harm that is simply “a setback to the organization’s abstract social interests,” the very thing Havens indicated was not a “concrete and demonstrable injury to the organization’s activities.” Havens, 455 U.S. at 379, 102 S.Ct. 1114; see also Sierra Club v. Morton, 405 U.S. 727, 738-39, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (holding that an organization’s abstract interest in a problem, without direct harm, is insufficient to establish standing). After all, an organization created to advance enforcement of a law is not hampered in its mission because the law is violated: absent violations, the organization would have to find a new mission. Furthermore, the organization has no legally protected interest in keeping its budget allocation constant, especially in the face of new opportunities to advance its mission. New organizational undertakings by definition divert resources but, as shown below, nothing about such diversion is per se harmful. Smith’s ruling to the contrary is in tension with the Supreme Court’s requirement that an organization actually suffer a “concrete and particularized injury.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130.
B
This case brings the strain between our case law and Supreme Court precedent close to a rupture.
As noted above, the Fair Housing Councils have the mission of eliminating unlawful housing discrimination, in part through investigation, education and outreach. Before bringing this litigation, the organizations purposely decided to advance their mission by focusing on discrimination in online housing advertisements, such as those allegedly contained on Roommate’s site. Pursuant to this intentional allocation of resources, both Fair Housing Councils spent time investigating Roommate’s website to find specific instances of discrimination. Further, Fair Housing Council San Diego hosted a conference “on the topic of the Internet and fair housing” and “conducted approximately 49 outreach presentations” on the subject. Fair Housing Council of San Fernando Valley “sent an education letter and fair housing packet to sixty-four (64) media and advertising sources with explicit mention of the fair housing concerns with advertising listings in the electronic form,” along with “devot[ing] more time to the problem of discriminatory rental listings” in its training seminars. In short, the Fair Housing Councils spent money investigating and addressing the exact problem they were established to address, housing discrimination, in the exact way they planned to address such problems, education and outreach.
If anything, their newfound topical focus on Internet housing advertisements reflected the Fair Housing Councils’ considered judgments of how they could best accomplish their goals in the face of changing client needs created by new technology. As they acknowledged, the Internet was a “new frontier” of housing discrimination. In response to this “trend” and the “sheer numbers” of housing discrimination issues raised by websites like Roommate’s, the Fair Housing Councils made Internet advertising a “major focus of [their] outreach efforts.” Therefore, the alleged “diversion” here was a voluntary redirection of more resources to areas *1227 where there were more housing problems and where the Fair Housing Councils could make a bigger impact advancing their missions. This represents adaptive and savvy organizational management, not injury. See Fair Emp’t Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1277 (D.C.Cir.1994) (“One can hardly say that BMC [an allegedly discriminatory employer] has injured the Council merely because the Council has decided that its money would be better spent by testing BMC than by counseling or researching.”).
Given this record, it is clear that Roommate’s activities did not cause the Fair Housing Councils to incur an injury-in-fact that meets the Lujan standard. The Fair Housing Councils suffered no invasion of their organizational interest in obtaining funding, collecting dues or recruiting members; nor were they hampered from advancing their mission. In holding otherwise, we are faithful to our precedent, but unfaithful to Lujan.
Where Supreme Court precedent is contrary to our precedent, we are the ones that have to change. Cf. Atonio v. Wards Cove Packing Co., Inc., 810 F.2d 1477, 1478-79 (9th Cir.1987). I suggest that it is time we revisited our circuit’s test en banc.
II
In addition to my concern about our standing inquiry, I must respectfully dissent from the majority’s decision to “apply the canon of constitutional avoidance to find that FEHA does not reach the selection of roommates.” Maj. Op. at 1222-23. The interpretive canon of constitutional avoidance directs that “where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems.” Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). But this interpretive tool can be used only when a statute is ambiguous. It does not give federal courts the power to “rewrite a state law to conform it to constitutional requirements.” Virginia v. Am. Booksellers Ass’n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).
In this case, FEHA’s language and its application by the California agency tasked with interpreting it suggest that FEHA is “unambiguous on the point under consideration here.” See Salinas v. United States, 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). FEHA expressly defines “discrimination” as not including “the use of words stating or tending to imply that the housing being advertised is available only to persons of one sex,” in a situation “[w]here the sharing of living areas in a single dwelling unit is involved.” Cal. Gov. Code § 12927(c)(2)(B). This language is not in the FHA. Because a statute’s “mention of [one example] implies the exclusion of others not mentioned,” United Dominion Indus., Inc. v. United States, 532 U.S. 822, 836, 121 S.Ct. 1934, 150 L.Ed.2d 45 (2001), FEHA’s definition of “discrimination” in § 12927(c)(2)(B) expresses the state legislature’s intent to exempt sex-specific advertisements for shared living units in a single dwelling from the restrictions of FEHA, but not exempt advertisements that discriminate on the basis of other protected characteristics, such as race or religion.[3]
*1228 This plain-language reading of § 12927(c)(2)(B) is confirmed by the decision of the California Fair Employment and Housing Commission[4] in Dep’t of Fair Emp’t and Housing v. Larrick, FEHC Dec. No. 98-12, 1998 WL 750901 (July 22, 1998). Larrick involved two roommates who decided not to rent to a potential third roommate because she was black. Id. at *3. The Commission held that the “plain language” of FEHA applied to this shared living situation and prohibited the two roommates “from rejecting an applicant on the basis of race and color.” Id. at *5. In arriving at this conclusion, the Commission stated that none of FEHA’s exceptions were applicable, specifically noting that § 12927(c)(2)(B) “allow[s] sex-specific (but not race-specific) advertisements for single dwellings with shared living areas.” Id. at *6 n. 2.
Because FEHA (unlike the FHA) is unambiguous regarding its applicability to shared living arrangements, the majority cannot interpret FEHA in a way to avoid the constitutional problems that may arise if the act is applied to bar advertisements for shared living arrangements that discriminate on the basis of protected characteristics such as race or religion. The constitutionality of FEHA’s applicability to such shared living arrangements is both novel and difficult. Given that neither the Fair Housing Councils nor Roommate addressed this issue in their briefs, I would remand this issue to allow the district court to hear from the parties and rule on this issue in the first instance. Therefore, I respectfully dissent from Part IV of the opinion.

. If either of the Fair Housing Councils had asserted standing on behalf of its members, it would need to show that its "[1] members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization’s purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.” Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). But here, the Fair Housing Councils assert only organizational standing.

. There also must be a causal connection between the injury and the defendant’s conduct, and the injury must be redressable by a favorable decision. Id. at 560-61, 112 S.Ct. 2130.

. The majority contends that we can ignore this amendment to FEHA because the "acts of a subsequent legislature tell us nothing definitive about the meaning of laws adopted by an earlier legislature.” Maj. Op. at 1223. But in determining whether a statute is ambiguous, we must construe the current version of the law, not what it used to be. See Red Lion *1228 Broad. Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (holding that a court must give "great weight” to amendments to a statute that clarify its proper construction). Once a duly enacted amendment clarifies a statute, it is no longer ambiguous, and we cannot treat it as such by pointing to its former ambiguity.

. The Commission is the California "agency charged with adjudicating FEHA enforcement actions and interpreting FEHA by regulation.” Green v. State, 42 Cal.4th 254, 64 Cal.Rptr.3d 390, 165 P.3d 118, 128 (2007); see also Cal. Gov.Code § 12935(a).