**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

XILINX, INC., AND CONSOLIDATED
SUBSIDIARIES,
   *Petitioner-Appellee,*

   v.

COMMISSIONER OF INTERNAL
REVENUE,
   *Respondent-Appellant.*

No. 06-74246

Tax Ct. No.
702-03

XILINX, INC., AND CONSOLIDATED
SUBSIDIARIES,
   *Petitioner-Appellee,*

   v.

COMMISSIONER OF INTERNAL
REVENUE,
   *Respondent-Appellant.*

No. 06-74269

Tax Ct. No.
4142-01

OPINION

Appeal from a Decision
of the United States Tax Court
Maurice B. Foley, Tax Court Judge, Presiding

Argued and Submitted
March 12, 2008—San Francisco, California

Filed May 27, 2009

Before: Stephen Reinhardt, John T. Noonan, Jr. and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Noonan

6151

**COUNSEL**

Ronald B. Schrotenboer, Kenneth B. Clark (argued) and Tyler A. Baker, Fenwick & West LLP, Mountain View, California, for the petitioner-appellee.

Gilbert S. Rothenberg, Richard Farber and Arthur T. Catterall (argued), Tax Division, Department of Justice, Washington, D.C., for the respondent-appellant.

Alice E. Loughran, Steptoe & Johnson LLP, Washington, D.C., for amici curiae Cisco Systems, Inc., and Altera Corporation.

A. Duane Webber, Baker & McKenzie LLP, Washington, D.C., for amici curiae Software Finance and Tax Executives Council and AeA.

**OPINION**

FISHER, Circuit Judge:

On this appeal from the tax court, we must decide whether, under the tax regulations in effect during tax years 1997, 1998 and 1999, related companies engaged in a joint venture to develop intangible property must include the value of certain stock option compensation one participant gives to its employees in the pool of costs to be shared under a cost sharing agreement, even when companies operating at arm's length would not do so. The tax court found related companies are not required to share such costs and ruled that the

Commissioner of Internal Revenue's attempt to allocate such costs was arbitrary and capricious. We reverse and hold: (1) related companies in a cost sharing agreement to develop intangibles must share *all* costs related to the joint venture, even if unrelated companies would not do so; (2) stock options for which companies claim tax deductions are a cost under former 26 C.F.R. § 1.482-7(d)(1); and (3) such costs are "related to" the intangible product development, as part of the compensation package offered to employees involved in activities under the joint venture.[1]

## I.   BACKGROUND

Xilinx, Inc. ("Xilinx") researches, develops, manufactures, markets and sells integrated circuit devices and related development software systems. Xilinx wanted to expand its position in the European market and established Xilinx Ireland ("XI") in 1994 as an unlimited liability company under the laws of Ireland. XI sold programmable logic devices and conducted research and development ("R&D"). Two wholly owned Irish subsidiaries of Xilinx owned XI during the tax years of 1997, 1998 and 1999, the only years at issue in this appeal.

In 1995, Xilinx and XI entered into a Cost and Risk Sharing Agreement ("the Agreement"), which provided that all right, title and interest in new technology developed by either Xilinx or XI would be jointly owned. Under the Agreement, each party was required to pay a percentage of the total R&D costs in proportion to the anticipated benefits to each from the new technology that was expected to be created. Specifically, the Agreement required the parties to share: (1) direct costs, defined as costs directly related to the R&D of new technol-

---

[1]For the purposes of this opinion, all citations and references to regulations are to the regulations in effect during tax years 1997, 1998 and 1999. The relevant regulations have been amended repeatedly since then, most recently in 2009, *see, e.g.,* T.D. 9441, 2009-7 I.R.B. 460.

ogy, including, but not limited to, salaries, bonuses and other payroll costs and benefits; (2) indirect costs, defined as costs incurred by departments not involved in R&D that generally benefit R&D, including, but not limited to, administrative, legal, accounting and insurance costs; and (3) costs incurred to acquire products or intellectual property rights necessary to conduct R&D. The Agreement did not specifically address whether employee stock options (ESOs) were a cost to be shared.

Xilinx offered ESOs to its employees under two plans. Under one plan, employees were granted options as part of the employee hiring and retention program. The options were of two varieties: incentive stock options (ISOs) and nonstatutory stock options (NSOs). Employees could exercise these options two ways: (1) by purchasing the stock at the market price on the day the option was issued ("exercise price") regardless of its then-current market price or (2) by simultaneously exercising the option at the exercise price and selling it at its then-current price, pocketing the difference. Under the other plan, employees could acquire employee stock purchase plan shares (ESPPs) by contributing to an account through payroll deductions and purchasing stock at 85 percent of either its exercise price or its market price on the purchase date. Employees must always pay taxes on NSOs, *see* 26 U.S.C. § 83, but have to pay taxes on ISOs and ESPPs only if they sell acquired stock shares before a specified waiting period has expired ("a disqualifying disposition"), *see* 26 U.S.C. § 421(b). In determining the R&D costs to be shared under the Agreement for tax years 1997, 1998 and 1999, Xilinx did not include any amount related to ESOs.

In tax years 1997, 1998 and 1999, Xilinx deducted as business expenses under 26 U.S.C. §§ 83 and 162 approximately $41,000,000, $40,000,000 and $96,000,000, respectively, based on its employees' exercises of NSOs or disqualifying dispositions of ISOs and ESPPs.[2] It also claimed an R&D

---

[2]Under 26 U.S.C. § 162(a)(1), employers may deduct from their taxable income "all the ordinary and necessary expenses paid or incurred during

credit under 26 U.S.C. § 41 for wages related to R&D activity, of which approximately $34,000,000, $23,000,000 and $27,000,000 in the respective tax years were attributable to exercised NSOs or disqualifying dispositions of ISOs and ESPPs.[3] Furthermore, in 1996 Xilinx and XI entered into two agreements that allowed XI employees to acquire options for Xilinx stock. Both agreements provided XI would pay Xilinx for the "cost" of the XI employees' exercise of the stock options, which was to equal the stock's market price on the exercise date minus the exercise price. In the 1997, 1998 and 1999 tax years, XI paid Xilinx $402,978, $243,094 and $808,059, respectively, under these agreements.

The Commissioner of Internal Revenue ("Commissioner") issued notices of deficiency against Xilinx for tax years 1997, 1998 and 1999, contending ESOs issued to its employees involved in or supporting R&D activities were costs that should have been shared between Xilinx and XI under the Agreement. Specifically, the Commissioner concluded the amount Xilinx deducted under 26 U.S.C. § 83(h) for its employees' exercises of NSOs or disqualifying dispositions of ISOs and ESPPs should have been shared. By sharing those costs with XI, Xilinx's deduction would be reduced, thereby increasing its taxable income. The Commissioner's determination resulted in substantial tax deficiencies and accuracy-related penalties under 26 U.S.C. § 6662(a).

Xilinx timely filed suit in the tax court. The tax court denied cross motions for summary judgment. After a bench

the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." Under 26 U.S.C. § 83(h), employers may deduct under § 162 the value of any property transferred to an employee in connection with the performance of employment.

[3]Under 26 U.S.C. § 41(b)(2)(A), companies can claim a tax credit for "wages paid or incurred to an employee for qualified [research] services performed by such employee."

trial, the tax court found that two unrelated parties in a cost sharing agreement would not share any costs related to ESOs. After assuming ESOs were costs for purposes of 26 C.F.R. § 1.482-7(d)(1), the tax court then found 26 C.F.R. § 1.482-1(b)(1) — which requires cost sharing agreements between related parties to reflect how two unrelated parties operating at arm's length would behave — dispositive and concluded the Commissioner's allocation was arbitrary and capricious because it included the ESOs in the pool of costs to be shared under the Agreement, even though two unrelated companies dealing with each other at arm's length would not share those costs.

The Commissioner timely appealed. On appeal, the parties focused primarily on whether the requirement in 26 C.F.R. § 1.482-7(d)(1) that "all costs" be shared between related parties in a cost sharing agreement or the requirement in 26 C.F.R. § 1.482-1(b)(1) that all transactions between related parties reflect what two parties operating at arm's length would do controlled. After oral argument, we requested supplemental briefing on whether ESOs were "costs" and whether they were "related to" the intangible product development for purposes of 26 C.F.R. § 1.482-7(d)(1), and whether a literal application of 26 C.F.R. § 1.482-7(d)(1) would conflict with a tax treaty between the United States and Ireland that was in effect during the 1998 and 1999 tax years.

## II.   STANDARD OF REVIEW

"Decisions of the tax court are reviewed on the same basis as decisions from civil bench trials in the district court." *DHL Corp. v. Comm'r*, 285 F.3d 1210, 1216 (9th Cir. 2002). "Thus, we review the tax court's conclusions of law de novo and its factual findings for clear error." *Id*.

## III.    DISCUSSION

The Commissioner does not dispute the tax court's factual finding that unrelated parties would not share ESOs as a cost.

Instead, the Commissioner maintains ESOs are a cost that must be shared under § 1.482-7(d)(1), even if unrelated parties would not share them.

### A. 26 C.F.R. §§ 1.482-1(b)(1) and 1.482-7(d)(1) Are Irreconcilable, so § 1.482-7(d)(1), the More Specific of the Two, Controls.

Congress has authorized the Secretary of the Treasury to allocate income and deductions among related business entities to prevent tax avoidance.

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

26 U.S.C. § 482. The Secretary in turn promulgated regulations authorizing the Commissioner to allocate income and deductions among related entities. The introduction to these regulations explains:

> The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes

with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. This section sets forth general principles and guidelines to be followed under section 482.

26 C.F.R. § 1.482-1(a)(1).[4] The next subsection states that the standard to be employed "in every case" to ensure taxpayers accurately reflect income from controlled transactions and do not avoid taxes through such transactions is an arm's length standard:

In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances.

26 C.F.R. § 1.482-1(b)(1).

Another section, however, specifically governing cost sharing agreements between controlled parties to develop intangible property authorizes the Internal Revenue Service "to make

---

[4]Controlled taxpayer is defined as "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers." 26 C.F.R. § 1.482-1(i)(5).

each controlled participant's share of the costs (as determined under [§ 1.482-7(d)]) of intangible development under the qualified cost sharing arrangement equal to its share of reasonably anticipated benefits attributable to such development . . . ." 26 C.F.R. § 1.482-7(a)(2). Controlled participants must include "all" costs in the pool of costs to be shared proportionally (the "all costs requirement"):

> For purposes of this section, a controlled participant's costs of developing intangibles for a taxable year mean all of the costs incurred by that participant related to the intangible development area, plus all of the cost sharing payments it makes to other controlled and uncontrolled participants, minus all of the cost sharing payments it receives from other controlled and uncontrolled participants. Costs incurred related to the intangible development area consist of: operating expenses, as defined in § 1.482-5(d)(3), other than depreciation or amortization expense, plus (to the extent not included in such operating expenses, as defined in § 1.482-5(d)(3)) the charge for the use of any tangible property made available to the qualified cost sharing arrangement.

26 C.F.R. § 1.482-7(d)(1). "Operating expenses" are defined as "includ[ing] all expenses not included in cost of goods sold except for interest expense, foreign income taxes [and] domestic income taxes, and any other expenses not related to the operation of the relevant business activity." 26 C.F.R. § 1.482-5(d)(3). How these various provisions interact is the crux of the parties' dispute.

[1] Section 1.482-1(b)(1) specifies that the true taxable income of controlled parties is calculated based on how parties operating at arm's length would behave. The language is unequivocal: this arm's length standard is to be applied "in every case." In the context of cost sharing agreements, this would require controlled parties to share only those costs

uncontrolled parties would share. By implication, costs that uncontrolled parties would not share need not be shared. In contrast, § 1.482-7(d)(1) specifies that controlled parties in a cost sharing agreement must share *all* "costs . . . related to the intangible development area," and that phrase is explicitly defined to include virtually all expenses not included in the cost of goods. The plain language does not permit any exceptions, even for costs that unrelated parties would not share. Each provision's plain language mandates a different result. Accordingly, we conclude the two provisions establish distinct and irreconcilable standards for determining which costs must be shared between controlled parties in cost sharing agreements specifically related to intangible product development.

The structure of the regulatory regime confirms this conclusion. Section 1.482-1(b)(2) explains that "[s]ections 1.482-2 through 1.482-6 provide specific methods to be used to evaluate whether transactions between or among members of the controlled group satisfy the arm's length standard, and if they do not, to determine the arm's length result." Section 1.482-1(c)(1)'s "best method rule" explains how the Commissioner and taxpayers should determine which of these methods provides the most reliable measure of the arm's length result: "the two primary factors to take into account are the degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables, and the quality of data and assumptions used in the analysis." Notably, § 1.482-7 is not included among the methods specified in § 1.482-1(b)(2) for determining the arm's length result, and the comprehensive definition of "costs . . . related to the intangible development area" does not implicate the factors identified in § 1.482-1(c)(1). Thus, §§ 1.482-1 through 1.482-6 establish a sophisticated methodology for comparing controlled transactions to uncontrolled transactions that is generally applicable when determining what items must be allocated among related parties. The regulatory regime then addresses a particular type of controlled transaction — cost sharing agreements

related to intangible product development — and establishes a comprehensive definition of what costs must be shared that does not turn on similar uncontrolled transactions. Section 1.482-7 thus appears to be a self-contained provision creating an exception to the general methodology established in the earlier provisions. As long as taxpayers comply with the requirement of sharing all intangible development costs proportionally to the expected benefit, *see* 26 C.F.R. § 1.482-7(b)(2) (requiring "each participant's share of intangible development costs . . . reflect that participant's share of anticipated benefits"), they are assured the district director will not "make allocations" and revise the claimed tax liability attributable to the cost sharing agreement, 26 C.F.R. § 1.482-7(a)(2). A bright line rule governs what costs must be shared, rather than comparing the cost sharing agreement to similar agreements between unrelated parties.

In fact, the regulatory history suggests the Secretary viewed cost sharing agreements related to intangible product development as a unique type of controlled transaction meriting a distinct method of analysis. The 1986 amendments to 26 U.S.C. § 482 reflected Congress' particular concern over transfers and licenses of intangible property, but the conference committee report explaining those amendments recognized that "many important and difficult issues under section 482 [we]re left unresolved by this legislation" and suggested "a comprehensive study of intercompany pricing rules . . . should be conducted" and "careful consideration should be given to whether the existing regulations could be modified in any respect." H.R. Conf. Rep. No. 99-841, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4726. In response, the Internal Revenue Service and Treasury Department conducted a detailed study of controlled party transactions, publishing its results in 1988. *See* I.R.S. Notice 88-123, 1988-2 C.B. 458. The study "primarily considered transfers of intangibles, but it also addressed the application of section 482 to other transactions," including cost sharing agreements. Intercompany Transfer Pricing and Cost Sharing Regulations Under Section

482, 57 Fed. Reg. 3571, 3572 (proposed Jan. 30, 1992). The Secretary then promulgated the precursors of §§ 1.482-1 through 1.482-6 and § 1.482-7 in 1992 as a single proposed regulation, *id.*, but did not finalize the comprehensive all costs requirement in § 1.482-7(d)(1) until December 1995, *see* T.D. 8632, 1996-4 I.R.B. 6, six months after the rest of the Section 482 regulations were finalized, *see* T.D. 8552, 1994-31 I.R.B. 4. The Secretary's separate regulatory action addressing cost sharing agreements related to intangible product development lends further support to our conclusion that the all costs requirement is different from the arm's length standard generally applicable to other controlled transactions.[5]

**[2]** Because the all costs requirement is irreconcilable with the arm's length standard, we hold § 1.482-7(d)(1) controls, in light of the "elementary tenet of statutory construction that where there is no clear indication otherwise, a specific statute will not be controlled or nullified by a general one," *Santiago Salgado v. Garcia*, 384 F.3d 769, 774 (9th Cir. 2004) (citations and internal quotation marks omitted); *see also Long*

---

[5]The parties and amici spend considerable time parsing the legislative history of 26 U.S.C. § 482. The statute, however, simply delegates authority to the Secretary to adjust taxable income of controlled parties to prevent tax evasion. It prescribes no particular methodology for doing so, except in the case of transfers and licenses of intangible property (types of transactions not at issue in this case), and does not mention cost sharing agreements. The 1986 conference committee report acknowledged the 1986 amendments did not resolve every problem inherent in controlled transactions and suggested the Secretary study the issue further and refine the regulations as needed, which the Secretary did. Congress plainly did not resolve how cost sharing agreements related to intangible development should be evaluated, and we decline the parties' invitation to interpret the regulations by attempting to divine a hypothetical intent from a statute that is silent on the issue we face. *See Pac. Nw. Generating Coop v. Dep't of Labor*, 550 F.3d 846, 860-61 (9th Cir. 2008) ("When relevant statutes are silent on the salient question, we assume that Congress has implicitly left a void for the agency to fill, and, therefore, we defer to the agency's construction of its governing statutes, unless that construction is unreasonable." (internal quotation marks and alteration omitted)).

*Island Care at Home, Ltd. v. Coke*, 127 S.Ct. 2339, 2348 (2007) (applying this canon of construction to regulations). Section 1.482-7 applies to cost sharing agreements related to intangible development, which is the particular controlled transaction at issue here, and specifies that "all costs . . . related to the intangible development area" must be included in the pool of costs to be shared. The general requirement in § 1.482-1(b)(1) that the arm's length standard should apply in every case involving a controlled transaction does not override such a specific provision.[6]

We are not persuaded by either party's attempts to harmonize the two provisions. Xilinx argues that § 1.482-1(b)(1)'s "in every case" language requires us to construe § 1.482-7(d)(1)'s all costs requirement to mean that parties must share only those costs that parties operating at arm's length would share, suggesting § 1.482-7(d)(1) did not explicitly incorpo-

---

[6]The dissent of our learned colleague, for whom we have the greatest respect, contends we should instead apply the canon of construction that doubts about the meaning of tax provisions should be resolved against the government. Dissent at 6181 (citing *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 839 (Thomas, J., concurring)). This canon, however, applies where language in a revenue provision is ambiguous. *See, e.g.*, *Bowers v. New York & Albany Lighterage Co.*, 273 U.S. 346, 348-49 (1927) (interpreting meaning of "proceeding" in tax provision establishing statute of limitations for collection of back taxes); *United States v. Merriam*, 263 U.S. 179, 184 (1923) (interpreting meaning of "bequest" to determine if gift was taxable income). We have not found any case resorting to this canon to resolve a conflict between two unambiguous tax provisions.

In any event, it is not the only canon of construction relevant to revenue provisions. There is a countervailing tradition under which tax provisions that merely create "an exception from a general revenue duty for the benefit of some taxpayers" are construed in favor of the government. *United Dominion*, 532 U.S. at 839 n.1 (Stevens, J., dissenting) (citing cases). In this case, we are determining how related parties in a cost sharing agreement must apportion business costs, which offset taxable income as a deduction under 26 U.S.C. § 162(a). Thus, even if these competing canons apply when two unambiguous provisions conflict, it would be more appropriate to resolve the conflict in favor of the government.

rate an arm's length standard because that requirement is implicit, and controlling, in light of § 1.482-1(b)(1). Although this explanation at first seems plausible, we are not ultimately persuaded. To read such a qualification into the precise and comprehensive language of §§ 1.482-5(d)(3) and 1.482-7(d)(1) would ignore the plain meaning and context of the cost sharing provisions, specifically "all" costs "related to" intangible development. "All" means "the entire number, amount or quantity" or "every," *American Heritage College Dictionary* 35 (3d ed. 2000), and "related" means "[b]eing connected [or] associated," *id*. at 1152. These terms, taken together with the regulation's sub-definitions, describe a fixed set of costs that must be shared in their totality and that will not vary based on the type of intangible property being developed. Transporting an arm's length standard into § 1.482-7(d)(1) would transform this apparently all encompassing and self-contained *description* of the costs to be shared into a *methodology* under which the costs to be shared would not be fixed by these defined terms but would rather ultimately be defined by the conduct of unrelated parties. Significantly, achieving an arm's length result is not itself the regulatory regime's goal; rather, its purpose is to prevent tax evasion by ensuring taxpayers accurately reflect taxable income attributable to controlled transactions.[7] *See* 26 C.F.R. § 1.482-1(a)(1). During the regulatory process, the Secretary concluded cost sharing agreements related to intangible development merited separate attention. The plain language in the finalized § 1.482-7 articulates a bright line rule, which appears to reflect a judgment that intangible product development through cost sharing agreements presents a special case

---

[7]Although the second sentence of § 1.482-1(a)(1) does note that Section 482 places controlled taxpayers on a tax parity with uncontrolled taxpayers, the first sentence of § 1.482-1(a)(1) states that "[t]he purpose of Section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions." Thus, we disagree with our dissenting colleague that the regulatory regime's singular purpose is to ensure tax parity. Dissent at 6180.

requiring a distinct approach to ensure related parties do not evade taxes. Under the circumstances, we are reluctant to import a general standard into a comprehensive definition contained in a highly specific regulation.[8]

On the other hand, the Commissioner argues that the word "generally" in § 1.482-1(b)(1) means there are exceptions to using "the results of comparable transactions under comparable circumstances" to determine the arm's length result and that § 1.482-7(d)(1)'s all costs requirement is such an exception. In context, however, the sentence containing the language quoted above conveys that identical transactions between unrelated parties — which are the ideal for determining "the results that would have been realized if controlled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)," § 1.482-1(b)(1) — are rare, so comparable transactions are "generally" the only feasible way to determine the arm's length result. Moreover, § 1.482-1(b)(2) does not list § 1.482-7 among the sections providing specific methods for calculating the arm's length result, so the Commissioner's suggestion that § 1.482-7(d)(1)'s all costs requirement is simply another method of determining the arm's length result is implausible. *See Boudette v. Barnette*, 923 F.2d 754, 756-57 (9th Cir. 1991) (holding "when a statute designates certain . . . manners of operation, all omissions should be understood as exclusions"). Finally, the Commissioner has presented no evidence that any companies operating at arm's length share ESO costs and does not challenge the tax court's finding that unrelated par-

---

[8]We do not address the parties' dispute over whether we should defer to the Commissioner's interpretation of the regulations, which was not announced until these tax proceedings began. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (declining to defer to proffered agency interpretation that "appear[ed] to be nothing more than an agency's convenient litigating position"). We conclude the all costs requirement is not affected by unrelated parties' conduct based on the regulatory regime's plain language, structure and development, not on the Commissioner's proffered construction.

ties would not do so. If unrelated parties operating at arm's length would not share the ESO cost, requiring controlled parties to share it is simply not an arm's length result. *See* 26 C.F.R. § 1.482-1(b)(1) (defining "arm's length result" as consistent "with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances").[9]

We also disagree with the dissent that the United States-Ireland Tax Treaty and the Treasury Department's Technical Explanation of that treaty are useful "guides" in determining which of the two irreconcilable standards governs.[10] Dissent at 6181-84. To be sure, the Technical Explanation, which was issued while the tax regulations at issue in this case were in effect, states that the treaty incorporates the arm's length principle from United States tax law, "refers to the arm's length standard as decisive" and "makes no specific mention of the

---

[9]The arm's length standard is a regulatory gloss on the Secretary's statutory authority to allocate income to avoid tax evasion, and the Secretary has since modified the regulations to state explicitly that ESOs are costs that must be shared and that the all costs requirement is an arm's length result, *see* 26 C.F.R. § 1.482-7T(a) & (d)(1)(iii) (2009), despite the absence of any evidence that unrelated parties share ESOs. Congress and regulators may adopt a technical definition of a term that is distinct from its plain meaning, *see, e.g., Ernzen v. United States*, 922 F.2d 1433, 1436 (9th Cir. 1991) (discussing technical statutory definition of "contribution" in 26 U.S.C. § 72(r)), but we are concerned here only with the regulations in effect in 1997, 1998 and 1999, which did not explicitly define an "arm's length" result to require sharing of ESOs.

[10]Although the dissent does not argue the treaty and Technical Explanation trump § 1.482-7, it maintains those documents can "obviate a potential conflict" between the regulations. Dissent at 6186. This is possible, however, only if they override § 1.482-7's plain language, and the dissent cites no authority in support of the novel proposition that an agency's interpretation of a treaty should supplant a duly enacted regulation. Treaty interpretations are undoubtedly entitled to great weight when construing an ambiguous treaty, *see Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982), but § 1.482-7 was promulgated through notice-and-comment rulemaking and therefore has the force and effect of law, *see United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).

[all costs requirement]." Dissent at 6183-84.[11] The dissent maintains the general arm's length standard should trump the specific all costs requirement because it is hard to believe the Treasury Department "conceal[ed] from its treaty parties that [the arm's length standard] had an exception when stock options were in question." Dissent at 6185. But this argument rests on the false premise that Treasury officials involved in the treaty negotiations believed the all costs requirement was inconsistent with the arm's length standard articulated in §§ 1.482-1 through 1.482-6. The dissent overlooks several details: (1) the Commissioner has always argued, before the tax court and on appeal, that the all costs requirement is consistent with the arm's length standard in § 1.482-1(b)(1); (2) the Treasury Department has never publicly differentiated between the two standards; and (3) the current regulations explicitly state the all costs requirement is consistent with the arm's length standard, *see* 26 C.F.R. § 1.482-7T(a) & (d)(1)(iii) (2009). By all appearances, the Treasury Department's consistent view over the years has been that requiring related parties in a cost sharing arrangement to share ESO costs is not incompatible with (1) international norms or (2) the regulatory arm's length standard under domestic tax law. Obviously, we have concluded the second view is not supported by the plain language of the regulations in effect during 1997, 1998 and 1999 (and we express no opinion on the first). But the dissent goes a step further by projecting our conclusion 12 years into the past and assuming the Treasury officials involved in negotiating and interpreting the tax treaty agreed with it, without offering any basis for doing so. As we have explained, we do not believe the Secretary accidentally

---

[11]These observations are not materially different from § 1.482-1(b)(1)'s statement that the arm's length standard applies "in every case." The dilemma in this case is that the arm's length standard, as articulated by the tax regulations in effect at the time the Technical Explanation was issued, is irreconcilable with the all costs requirement. A document that essentially mirrors language in the general regulation stating the general standard should always govern does not, in our view, offer much insight into which of two conflicting regulations should control.

promulgated a highly specific regulation that plainly requires related parties in cost sharing agreements to share all costs. The treaty documents do not alter our view.

**[3]** In sum, we conclude the arm's length regulation, § 1.482-1(b)(1), and the all costs regulation, § 1.482-7(d)(1), cannot be harmonized. Accordingly, we hold § 1.482-7(d)(1), being the more specific of the two, controls.

## B. Section 1.482-7(d)(1) Does Not Violate the United States-Ireland Tax Treaty.

**[4]** As noted, we requested supplemental briefing on whether § 1.482-7(d)(1) might be preempted for the tax years the United States-Ireland Tax Treaty was in effect. The tax treaty establishes that the appropriate standard for determining whether to reallocate profits from controlled transactions involving controlled parties is whether "conditions are made or imposed between the two enterprises in their commercial or financial relations that differ from those that would be made between independent enterprises." *See* 1997 United States-Ireland Tax Treaty, Art. 9, RIA Int. Tax Treaty 3057. The Department of the Treasury's treaty explanation confirms that this standard is identical to the arm's length standard in § 1.482-1(b)(1). *See* Department of the Treasury Technical Explanation of the 1997 United States-Ireland Tax Treaty, RIA Int. Tax Treaty 3095. Nonetheless, § 1.482-7(d)(1) does not conflict with the tax treaty in these circumstances, because the treaty expressly allows a contracting state to apply its domestic laws to its own citizens, even if those laws conflict with the treaty. *See* 1997 United States-Ireland Tax Treaty, Art. 1(4), RIA Int. Tax Treaty 3057 ("Notwithstanding any provision of [this treaty], a Contracting State may tax its residents . . . and its citizens, as if the [treaty] had not come into effect."). Xilinx is not a foreign entity, so applying § 1.482-7(d)(1) to it does not violate the treaty, even if the regulation's all costs requirement is at odds with the treaty's arm's length standard.

## C. ESOs for Which Companies Claim Tax Deductions Are Costs and Are Related to the Research and Development Activity, to the Extent They Are Given to Employees Involved In or Supporting that Activity.

Because § 1.482-7(d)(1) controls, the Commissioner properly allocated the ESO amounts only if they are "costs incurred by [Xilinx] related to the intangible development area."

### 1.    Certain ESO amounts are a cost.

Xilinx relies on the considerable evidence and testimony presented to the tax court that unrelated parties in a cost sharing agreement do not treat ESOs as costs to be shared. This evidence is beside the point — whether or not unrelated parties share an item is immaterial to whether it is a cost to either party. Xilinx also maintains ESOs are not costs because two provisions of § 1.482-7 allow taxpayers to use any accounting method as long as it is used consistently.[12] Xilinx reads these provisions to allow a taxpayer to establish conclusively what is or is not a cost by using a particular accounting method and sticking with it. Xilinx then argues that under one particular business accounting method, which was widely accepted when Congress passed 26 U.S.C. § 482 in the 1980s and was still an acceptable method during the tax years at issue, ESOs are not treated as costs.

[5] Xilinx's argument that § 1.482-7's accounting requirements allow taxpayers to self-define what is and is not a cost

---

[12]Those two subsections establish accounting requirements that taxpayers in a qualified cost sharing agreement must meet. First, they must "use a consistent accounting method to measure costs and benefits." 26 C.F.R. § 1.482-7(i). Second, they must maintain documentation to establish "[t]he accounting method used to determine the costs and benefits of the intangible development . . . and, to the extent that the method materially differs from U.S. generally accepted accounting principles, an explanation of such material differences." 26 C.F.R. § 1.482-7(j)(2)(i)(D).

by consistently using a particular accounting method is creative but unsound. The accounting requirements are minimum eligibility requirements for a qualified cost sharing agreement. It does not logically follow that whatever accounting method a taxpayer uses, even a nonstandard one, conclusively establishes what is a cost, even if that method differs from how the regulation defines costs. Rather, the regulation's accounting requirements are clearly intended to ensure the government has a basis upon which to verify whether taxpayers who obtain the benefit of a qualified cost sharing agreement are accurately reporting and sharing costs, i.e., not treating items that are costs under the regulation as something other than costs.

Also, the official accounting method upon which Xilinx relies, Accounting Principles Board Opinion No. 25 (1972) ("APB 25"), was superseded by Statement of Financial Accounting Standards No. 123 (1995) ("SFAS 123"). Although SFAS 123 allowed taxpayers to employ APB 25's methodology (under which these ESOs have zero cost) during the relevant tax years, SFAS 123 explained that the APB 25 method was no longer the preferred method for valuing ESOs, going so far as to require companies employing APB 25 also to report the cost of ESOs under SFAS 123's preferred fair value based method. Xilinx used APB 25 and treated the ESOs as a zero cost on its books, but it also complied with SFAS 123 and reported the ESO cost under the SFAS 123 fair value method in footnotes to its public income statements. Thus, although Xilinx did not violate business accounting practices in ascribing zero cost on its books to ESOs, the preferred business accounting practice during the relevant tax years treated ESOs as costs.

[6] In the end, Xilinx's argument is undermined by the regulatory language and its own tax returns. "Costs incurred related to the intangible development area [are] . . . operating expenses as defined in § 1-482.5(d)(3)," 26 C.F.R. § 1.482-7(d)(1), which provides that "operating expenses" include "all

expenses not included in cost of goods sold except for . . . any . . . expenses not related to the operation of the relevant business activity," 26 C.F.R. § 1-482.5(d)(3).[13] Xilinx stipulated that it did not include the value of the ESOs in the cost of goods sold, and it claimed tax deductions under 26 U.S.C. §§ 83 and 162 for the exercised NSOs and the disqualifying dispositions of the ISOs and ESPPs as business "expenses."[14] *See* 26 U.S.C. § 162(a)(1) (allowing employers to deduct "all the ordinary and necessary *expenses* paid or incurred" (emphasis added)). Xilinx could not have claimed deductions on these ESOs unless they were an "expense," which is the key term in the definition of "cost" under § 1.482-7(d)(1). Moreover, Xilinx required XI to pay it for the value of the ESOs XI employees exercised. Requiring reimbursement for ESOs granted to another company's employees further supports the conclusion that the ESOs are costs. In short, the preferred business accounting method in effect during the relevant tax years treated ESOs as costs, and Xilinx itself treated certain amounts of ESOs as "expenses" in claiming them as a tax deduction. Accordingly, we hold the ESO value that Xilinx deducted as a business expense is a "cost" for the purposes of § 1.482-7(d)(1).[15]

---

[13]For the sake of clarity, we analyze whether the ESOs are a "cost" and whether they are "related to" the joint venture separately. We recognize that this distinction is not altogether appropriate, because the meaning of "cost" turns on whether an item is an "operating expense," the definition of which focuses on whether the expense is "related to" the "relevant business activity." The proper construction of "cost" therefore turns on whether it is "related to" the activity. Because we conclude ESOs are "related to" the intangible product development area, however, our separate analysis of the two questions poses no problem.

[14]The Commissioner stipulated that the exercise (as opposed to disqualifying dispositions) of ISOs and ESPPs are not "operating expenses" within the meaning of § 1.482-5(d)(3). Accordingly, we have no occasion to decide whether those items are "costs" that must be shared.

[15]Xilinx also suggests the ESOs should not be treated as costs because they require no cash outlay. Presumably, however, Xilinx could obtain full market value for the stock shares it allows its employees to obtain at a lower price, so, at a minimum, the difference between the exercise price and the then-current market price is an opportunity cost to Xilinx. In any event, ESOs were treated as costs during the relevant tax years under tax accounting principles and the preferred business accounting methodology.

### *2.   ESOs are related to the intangible development area.*

**[7]** The tax court found the ESOs are part of Xilinx's employee recruitment and retention program, and Xilinx does not suggest salaries or benefits, like healthcare and retirement contributions, for employees involved in R&D activities are not "related to" their work on the R&D activities. It is difficult to view ESOs as anything but part of Xilinx's employee compensation package, because it is a benefit conferred in exchange for services rendered. ESOs are just as "related to" ("connected [or] associated" with) an employee's work as any other employment benefit or compensation. *See American Heritage College Dictionary* 1152 (3d ed. 2000). In fact, Xilinx claimed the ESOs as part of a tax credit available for "wages paid or incurred to an employee for qualified [research] services performed by such employee." 26 U.S.C. § 41(b)(2)(A). Xilinx's inclusion of ESOs as part of employee wages for the R&D tax credit undermines its attempt to avoid tax liability by arguing those ESOs are not "related to" the same research activity. Although "related to" in 26 C.F.R. § 1.482-7(d)(1) and "for" in 26 U.S.C. § 41(b)(2)(A) are not identical terms, they convey essentially the same thing in the context of each provision: the expense must be part of the compensation given to an employee involved in the relevant activity.

Accordingly, Xilinx's arguments that its ESOs have nothing to do with R&D, are issued company wide and are not viewed by the employees who receive them as related to their R&D are misplaced. The same can be said of any component of an employee's compensation package. For example, health benefits given to a company's employees are not tied to any particular task an employee performs, yet the cost of those benefits borne by the employer is still related to the work its employees do. (The cost of health benefits was specifically included among the items to be shared between Xilinx and XI as part of the total R&D costs.) For employees who work on

R&D, the cost of health benefits for that employee is plainly related to the company's R&D activities.

Xilinx also focuses on the considerable evidence it presented to the tax court proving companies operating at arm's length do not share the cost of ESOs. It maintains those companies would share ESO costs if they were in fact related to a joint venture, just as they share all other costs related to the project, and points out that not even the United States allows contractors hired to conduct R&D to bill the government for the cost of ESOs. Xilinx believes the reason companies operating at arm's length do not share ESOs must be that the cost is not related to the joint venture. The evidence presented to the tax court, however, suggests three reasons why companies operating at arm's length do not share ESO costs, none of which have anything to do with whether the cost is related to the joint venture. First, as Xilinx has pointed out, unlike most costs, companies bear no out-of-pocket expense for ESOs (in fact, the exercise of ESOs results in cash inflow). Even though companies can estimate the accounting cost of ESOs, the tax court found those costs cannot be measured *precisely*, so companies operating at arm's length may elect not to share ESOs, because agreeing how to value something with no present out-of-pocket cost might be a sticking point in negotiating an agreement. Second, the tax court noted the cost of ESOs is tied to the value of one company's stock, so sharing this cost might create a perverse incentive for the other company to minimize the economic value of the joint venture in order to keep its partner's stock value low and thereby limit its own share of the cost for its partner's ESOs. Finally, a company operating at arm's length has an incentive *not* to share ESO costs, to the extent those costs can be deducted as a business expense. What company would not like to bear the full cost of something that imposes no out-of-pocket expense and confers the benefit of a tax deduction? Although the record conclusively establishes that companies in a joint venture operating at arm's length do not share ESO costs, none of the

possible explanations for this fact demonstrate ESO costs are unrelated to the joint venture.

[8] Accordingly, we hold ESOs are related to the work performed by the employees who receive them. The ESO costs for employees who were involved in activities that would contribute to the joint venture between Xilinx and XI therefore should have been shared. Based on the record before us, however, we cannot conclusively determine whether the Commissioner's allocation is limited only to employees involved in the joint venture and takes into account whether employees spent all or only part of their time on tasks relevant to the joint venture. Accordingly, we remand to the tax court on the narrow issue of determining whether the Commissioner's allocation accurately reflects ESO costs for employees involved in tasks related to the joint venture.

## IV. CONCLUSION

We hold that 26 C.F.R. § 1.482-7(d)(1)'s all costs requirement is irreconcilable with 26 C.F.R. § 1.482-1(b)(1)'s requirement that an arm's length standard should apply in every case and that § 1.482-7(d)(1), as the more specific of the two provisions, controls. We further hold ESOs are "costs . . . related to the intangible development area" and therefore must be shared between controlled parties in a cost sharing agreement. We therefore reverse the tax court, because the Commissioner's allocation was appropriate to the extent it involved ESO costs Xilinx claimed as a business expense deduction and was limited to ESOs for employees involved in the joint venture. We remand so that the tax court may ensure the Commissioner's allocation is consistent with our holding.

[9] Xilinx may have been caught off guard by the deficiency notices, which is understandable given the absence of any public guidance that the Commissioner would interpret the cost sharing regulation to require sharing of ESO costs. This result is nonetheless mandated by the plain meaning of

§ 1.482-7(d)(1), which we have concluded controls over § 1.482-1(b)(1). We are troubled, however, by the imposition of accuracy related penalties here. Although we have construed the regulations in a manner favorable to the Commissioner, we rejected the Commissioner's attempted harmonization of §§ 1.482-1 and 1.482-7 along the way. Moreover, the Secretary has since promulgated new regulations "clarify[ing]" this issue by explicitly including ESOs as costs to be shared.[16] 68 Fed. Reg. 51171-02, 2003-2 C.B. 841. When even the government has found it necessary to clarify the regulations, we have our doubts that imposing a penalty on taxpayers for their failure to follow the letter of the law is appropriate. On remand, the tax court may also consider any defenses Xilinx raised against the Commissioner's imposition of accuracy related penalties.

**REVERSED and REMANDED.**

NOONAN, Circuit Judge, dissenting:

The Commissioner of Internal Revenue has issued regulations that are irreconcilable. These are the regulations relevant to this case. We have three alternatives:

1. Hold that when the Commissioner talks out of both sides of his mouth, his speech is unintelligible and his regulations are unenforceable.

---

[16]The current temporary regulations provide that controlled taxpayers' operating costs, which must be shared in a qualified cost sharing arrangement, "include . . . stock-based compensation." 26 C.F.R. § 1.482-7T(d)(1)(iii) (2009). Such expenses must "equal . . . the amount allowable to the controlled participant as a deduction for federal income tax purposes with respect to that stock-based compensation." 26 C.F.R. § 1.482-7T(d)(3)(iii) (2009).

2.   Apply a rule of thumb: the specific controls the general.

3.   Resolve the conflict based on the dominant purpose of the regulations, aided by the basic rule that ambiguous documents are to be interpreted against the drafter and further enlightened by the way the Treasury has proceeded in drafting tax treaties relevant to American parents and their foreign subsidiaries.

The majority has chosen the second alternative. It is a simple solution. It is plausible. But it is wrong. It converts a canon of construction into something like a statute. It ignores the international context and the Treasury's own practice. In what follows, I will spell out this mistake and why I chose the third alternative.

*The problem.* The majority put it well:

Section 1.482-1(b)(1) specifies that the true taxable income of controlled parties is calculated based on how parties operating at arm's length would behave. The language is unequivocal: this arm's length standard is to be applied "in every case." In the context of cost sharing agreements, this would require controlled parties to share only those costs uncontrolled parties would share. By implication, costs that uncontrolled parties would not share need not be shared. In contrast, § 1.482-7(d)(1) specifies that controlled parties in a cost sharing agreement must share *all* "costs . . . related to the intangible development area," and that phrase is explicitly defined to include virtually all expenses not included in the cost of goods. The plain language does not permit any exceptions, even for costs that unrelated parties would not share. Each provision's plain language mandates a different result. Accordingly, we conclude the two provisions establish distinct and irrec-

oncilable standards for determining which costs must be shared between controlled parties in cost sharing agreements specifically related to intangible product development. Maj. Op. 6162-63.

*The handy canon of construction.* Often the specific controls the general. This rule has been used by the Supreme Court. *E.g.*, *Long Island Care At Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2348 (2007). Apply this simple rule here, and section 1.482-7(d)(1) controls. The conflict dissolves. The Commissioner is vindicated.

This simple solution is all too pat. It gives controlling importance to a single canon of construction. But, as every judge knows, the canons of construction are many and their interaction complex. The canons "are not mandatory rules." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). They are guides "designed to help judges determine the Legislature's intent." *Id.* They can be "overcome" by "other circumstances" manifesting that intent. *Id.* The canons are "tools designed to help courts better determine what Congress intended, not to lead courts to interpret the law contrary to that intent." *Scheidler v. National Org. of Women, Inc.*, 547 U.S. 9, 23 (2006). In the light of these principles, three considerations show the Commissioner's position to be untenable.

*Purpose.* First, the purpose of the regulation is paramount. That purpose is parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions. The regulations are not to be construed to stultify that purpose. If the standard of arm's length is trumped by 7(d)(1) the purpose of the statute is frustrated. If Xilinx cannot deduct all its stock option costs, Xilinx does not have parity with an independent taxpayer. Under the majority's holding, the law is interpreted contrary to the intent of its maker.

*A basic rule.* Second, a very old canon of construction applies in this case, "in which the complex statutory and regu-

latory scheme leads itself to any number of interpretations." We resolve the inconsistencies against the government. *United Dominos Industries, Inc. v. United States*, 532 U.S. 822, 839 (2001) (Thomas, J., concurring and citing, among other cases, *United States v. Merriam,* 263 U.S. 179, 188 (1923) ("If the words are doubtful, the doubt must be resolved against the Government and in favor of the taxpayer")). This canon of construction is framed in the cases just cited as particularly relevant to tax statutes. It is, however, not a concession to taxpayers. It is the way legal documents are read. The draft is construed against the drafter.

*Treasury practice.* The purpose of the regulations and the normative rules of interpretation deny recognition to the Commissioner's position on 7(d)(1). Additionally, his own agency has undercut him in the tax treaty between the United States and Ireland, signed into law by President Clinton on July 28, 1997. The announced purpose of the tax treaty is "the avoidance of double taxation and the prevention of fiscal evasion with respect to income and capital gains."

The treaty reads:

Article 9 Associated Enterprises

1. Where:

(a) an enterprise of a Contracting State participates directly or indirectly in the management, control or capital of an enterprise of the other Contracting State; or

(b) the same persons participate directly or indirectly in the management, control, or capital of an enterprise of a Contracting State and an enterprise of the other Contracting State, and in either case conditions are made or imposed between the two

enterprises in their commercial or financial relations that differ from those that would be made between independent enterprises, then, any profits that, but for those conditions, would have accrued to one of the enterprises, but by reason of those conditions have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

2. Where a Contracting State includes in profits of an enterprise of that State, and taxes accordingly, profits on which an enterprise of the other Contracting State has been charged to tax in that other State, and the other Contracting State agrees that the profits so included are profits that would have accrued to the enterprise of the first-mentioned State if the conditions made between the two enterprises had been those that would have been made between independent enterprises, then that other State shall make an appropriate adjustment to the amount of the tax charged therein on those profits. In determining such adjustment, due regard shall be had to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.

1997 United States-Ireland Tax Treaty, RIA Int. Tax Treaty 3057.

The treaty adopts as its standard the transactions "that would be made between independent enterprises." That standard is the arm's length standard. No exceptions are provided. Arm's length is the international standard specifically governing Xilinx and XI.

A tax treaty is negotiated by the United States with the active participation of the Treasury. The Treasury's reading of the treaty is "entitled to great weight." *United States v. Stuart*, 489 U.S. 353, 369 (1989) (quoting *Sumitomo Shoji America, Inc. v. Aragliano*, 457 U.S. 176, 184-185 (1982)). Simultaneous with the signing of the treaty into law, the Treasury issued its "Technical Explanation." As to Article 9, the Explanation reads:

> This article incorporates in the Convention the arm's length principle reflected in the U.S. domestic transfer pricing provision, particularly Code section 482. It provides that when related enterprises engage in a transaction on terms that are not arm's length, the Contracting States may make appropriate adjustments to the taxable income and tax liability of such related enterprises to reflect what the income and tax of these enterprises with respect to the transaction would have been had there been an arm's length relationship between them.
>
> . . .
>
> The fact that a transaction is entered into between such related enterprises does not, in and of itself mean that a Contracting State may adjust the income (or loss) of one or both of the enterprises under the provisions of this Article. If the conditions of the transaction are consistent with those that would be made between independent persons, the income arising from that transaction should not be subject to adjustment under this Article.
>
> Similarly, the fact that associated enterprises may have concluded arrangements, such as cost sharing arrangements or general services agreement, is not in itself an indication that the two enterprises have entered into a non-arm's length transaction that

should give rise to an adjustment under paragraph 1. Both related and unrelated parties enter into such arrangements (e.g., joint venturers may share some development costs). As with any other kind of transaction, when related parties enter into an arrangement, the specific arrangement must be examined to see whether or not it met the arm's length standard. In the event that it does not, an appropriate adjustment may be made, which may include modifying the terms of the agreement or recharacterizing the transaction to reflect its substance.

It is understood that the "commensurate with income" standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm's-length standard. The implementation of this standard in the section 482 regulations is in accordance with the general principles of paragraph 1 of Article 9 of the Convention, as interpreted by the OECD Transfer Pricing Guidelines.

Department of the Treasury Technical Explanation of the 1997 United States-Ireland Tax Treaty, RIA Int. Tax Treaty 3095.

No fewer than five times, the Explanation refers to the arm's length standard as decisive. The Explanation adds that as to "transaction[s] . . . that are consistent with those that would be made between independent persons, the income from the transfer should not be subject to adjustment under this Article." The Explanation makes no specific mention of the "all-of-the-costs" standard. The Explanation glosses the statute's "commensurate with income standard" as "designed to operate consistently with the arm's length standard": the arm's length standard is treated as the measure, with which CWI is "designed to operate consistently." This standard is

further affirmed to be in accord with principles operative under the Transfer Pricing Guidelines of the Organisation for Economic Co-operation and Development.

It cannot easily or safely be supposed that the Treasury in negotiating the treaty was unaware of the "all-of-the-costs" regulation and its relation to stock options issued in connection with R&D. In oral argument before this court, counsel for the Commissioner expressed the relation between the different divisions of the Treasury by tightly clasping his two hands together, a gesture effectively communicating their unity of thought and action. The Commissioner as litigator cannot disavow the position that the Treasury repeatedly took in the Ireland and other tax treaties of which we take judicial notice. *See*, *e.g.*, United States-France, Article 9 (RIA Int. Tax Treaty 2225); United States-Germany, Article 9 (RIA Int. Tax Treaty 1542); and United States-United Kingdom, Article 9 (RIA Int. Tax Treaty 2546). In each of them, Article 9 takes transactions between independent companies as the measure.

Using the standard of what independent companies would do in their own cost-sharing arrangements, the Treasury could not have meant to conceal from its treaty parties that this standard had an exception when stock options were in question. There is good reason for the standard the Treasury chose: it is an internationally comprehensible standard. It does not require the treaty partner to recognize costs that may have no recognition in its law. If double taxation of the income of parent and subsidiary is to be avoided, a clear, simple, comprehensive standard is needed.

I do not reach the issue of whether the treaty obligations "constitute binding federal law enforceable in United States courts." *Medellin v. Texas*, 128 S.Ct. 1346, 1356 (2008). Even if the treaty and the Technical Explanation should be held not to operate as law trumping the hapless regulation, 7(d)(3), treaty and explanation act as guides. They tell us what the Treasury has had in mind in the regulations at issue. They

obviate a potential conflict. They illuminate what "tax parity" entails.

No remand is necessary. I vote to affirm the decision of the tax court.