MARVEL ENTERTAINMENT, LLC, AS SUCCESSOR TO MARVEL
ENTERTAINMENT, INC., F.K.A. MARVEL ENTERPRISES, INC.
AND AS AGENT FOR MEMBERS OF MARVEL ENTERPRISES,
INC. AND SUBSIDIARIES GROUP, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 12113–13.        Filed July 21, 2015.

MEG was an affiliated group that filed consolidated
returns. On Dec. 27, 1996, certain MEG member entities filed
for bankruptcy under 11 U.S.C. ch. 11 and subsequently
excluded cancellation of indebtedness (COD) income from
their respective gross incomes under I.R.C. sec. 108(a)(1)(A)
for MEG's short taxable year ending Oct. 1, 1998. Pursuant
to I.R.C. sec. 108(b)(2)(A), MEG reduced each member entity's
allocable share of consolidated net operating loss (CNOL) by
each member entity's previously excluded COD income. MEG
carried forward into its successor affiliated group a
$47,424,026 CNOL and used this amount to offset income of
the successor group for its taxable years ending Dec. 31, 2003
and 2004. R determined deficiencies for 2003 and 2004,
arguing that I.R.C. sec. 108(b)(2)(A) required MEG's 1998 tax
attribute reduction to occur at the consolidated level rather
than at the individual entity level. P, the successor to MEG

and as agent for the members of the affiliated group, timely filed a petition disputing R's determinations. *Held*: Where a member of a consolidated group has excluded COD income during a consolidated return year before the adoption of sec. 1.1502–28T, Temporary Income Tax Regs., 69 Fed. Reg. 12071 (Mar. 15, 2004), the NOL subject to reduction pursuant to I.R.C. sec. 108(b)(2)(A) is the entire CNOL of the consolidated group. *See United Dominion Indus., Inc. v. United States*, 532 U.S. 822 (2001).

*Mark J. Silverman*, *Michael H. Salama*, *Matthew D. Lerner*, and *Andrew F. Gordon*, for petitioner.

*Curt M. Rubin*, *Steven N. Balahtsis*, and *Lawrence L. Davidow*, for respondent.

OPINION

RUWE, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax for its consolidated taxable return years ending December 31, 2003 and 2004, of $2,144,756 and $14,453,653, respectively. Petitioner's deficiencies result from members of its predecessor consolidated group filing for bankruptcy under 11 U.S.C. chapter 11 and realizing cancellation of indebtedness (COD) income for the consolidated group's short taxable year ending October 1, 1998. Certain members of the predecessor consolidated group excluded the COD income from their respective gross incomes pursuant to section 108(a)(1)(A).[1] When subsequently reducing net operating loss (NOL) as required by section 108(b)(2)(A), each debtor member of the consolidated group reduced its allocable share of the group's consolidated net operating loss (CNOL) by its previously excluded COD income.

This matter is before the Court on the parties' cross-motions for summary judgment pursuant to Rule 121. The parties have asked this Court to decide, as a matter of law, whether a consolidated group's NOL subject to reduction under section 108(b)(2)(A) for its short taxable year ending October 1, 1998, is (1) the entire CNOL of the consolidated group or (2) a portion of the CNOL allocable to each member of the consolidated group. Accordingly, the only issue before

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for all relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.

the Court is the legal question concerning the NOL subject to reduction under section 108(b)(2)(A). This is an issue of first impression in this Court.

## *Background*

At the time the petition was filed, the principal place of business for Marvel Entertainment, LLC (petitioner),[2] was in New York, New York.

On December 27, 1996, Marvel Entertainment Group, Inc. (MEG), and certain of its operating and inactive subsidiaries—Fleer Corp. (Fleer), Skybox International, Inc., Marvel Characters, Inc., Heroes World Distribution, Inc. (Heroes), the Asher Candy Co., Malibu Comics Entertainment, Inc. (Malibu), Frank H. Fleer Corp., and Marvel Direct Marketing, Inc.—filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the U.S. Bankruptcy Court for the District of Delaware. At the time of its bankruptcy filings, MEG and its subsidiaries filed consolidated Federal income tax returns as members of a consolidated group of corporations whose common parent was Mafco Holdings, Inc.

On April 24, 1997, MEG and its subsidiaries became a separate affiliated group (MEG Group) and filed consolidated Federal income tax returns for the short taxable years ending December 31, 1997, and October 1, 1998.

On October 1, 1998, MEG Group was acquired by Toy Biz, Inc. (Toy Biz), pursuant to MEG Group's fourth amended plan of reorganization (fourth plan of reorganization). MEG and its subsidiaries became members of a new consolidated group of which Toy Biz was the common parent. As part of the transaction Toy Biz changed its name to Marvel Enterprises, Inc. In connection with the fourth plan of reorganiza-

---

[2] Petitioner is an entertainment company known for its comic book characters. On September 16, 2005, Marvel Enterprises, Inc. (Marvel Enterprises), merged with its wholly owned subsidiary Marvel Entertainment, Inc., with Marvel Enterprises surviving the merger but changing its name to Marvel Entertainment, Inc. On December 31, 2009, Marvel Entertainment, Inc., was acquired by the Walt Disney Co. (Disney) and was merged into Maverick Merger Sub, LLC (Maverick), a Delaware limited liability company wholly owned by Disney. Upon filing the certificate of merger with the secretary of state for the State of Delaware, Maverick changed its name to Marvel Entertainment, LLC.

tion, four MEG Group members had certain debts eliminated and realized COD income as follows:

| Member | COD income |
|--------|-----------|
| MEG .............................................. | $2,497,828 |
| Fleer .............................................. | 163,680,402 |
| Heroes ........................................... | 4,930,767 |
| Malibu ........................................... | 353,466 |
| Total ............................................. | 171,462,463 |

MEG, Fleer, Heroes, and Malibu each excluded its COD income from their respective gross incomes for the short taxable year ending October 1, 1998, pursuant to section 108(a)(1)(A).

Section 108(b)(2)(A) provides that the amount excluded under section 108(a)(1)(A) shall be applied to reduce tax attributes starting with any net operating loss for the taxable year and any net operating loss carryover to such taxable year. As of October 1, 1998, MEG Group had a CNOL of $187,154,680. For purposes of applying section 108(b)(2)(A), MEG Group allocated the CNOL among its consolidated group members as follows:

| Member | Share of CNOL |
|--------|--------------|
| MEG .............................................. | $71,330,567 |
| Fleer .............................................. | 82,656,671 |
| Heroes ........................................... | 4,058,504 |
| Malibu ........................................... | 2,707,590 |
| Total ............................................. | [1]160,753,332 |

[1] As of Oct. 1, 1998, MEG Group had a CNOL of $187,154,680. The record does not explain where the remaining $26,401,348 was allocated.

On its consolidated Federal income tax return for the short taxable year ending October 1, 1998, MEG Group reduced the share of CNOL separately attributable to each of MEG, Fleer, Heroes, and Malibu by the lesser of (1) each member's excluded COD income or (2) each member's allocable share of CNOL, as follows:

| | Allocated CNOL | Excluded COD income | Reduction of CNOL | Remaining CNOL |
|--------|--------------|--------------------|------------------|----------------|
| MEG | $71,330,567 | $2,497,828 | $2,497,828 | $68,832,739 |
| Fleer | 82,656,671 | 163,680,402 | 82,656,671 | -0- |
| Heroes | 4,058,504 | 4,930,767 | 4,058,504 | -0- |
| Malibu | 2,707,590 | 353,466 | 353,466 | 2,354,124 |
| Total | 160,753,332 | 171,462,463 | 89,566,469 | 71,186,863 |

MEG Group joined the Marvel Group on October 2, 1998, and carried forward into the Marvel Group its remaining $97,588,211[3] CNOL (CNOL carryforward). The CNOL carryforward was subsequently decreased to $96,391,831 on December 21, 1998, to reflect the dissolution of Fleer. Respondent examined MEG Group's consolidated Federal income tax return for its short taxable year ending October 1, 1998, and made no adjustments to the claimed CNOL carryforward.

MEG Group's CNOL carryforward of $96,391,831 was used by the Marvel Group in subsequent years to offset income as follows:

| Taxable year ending | CNOL carryforward | Income offset | Remaining CNOL |
|---|---|---|---|
| Dec. 31, 1999 | $96,391,831 | $797,679 | $95,594,152 |
| Dec. 31, 2001 | 95,594,152 | 29,862,818 | 65,731,334 |
| Dec. 31, 2002 | 65,731,334 | 18,307,308 | 47,424,026 |

Respondent did not examine the Marvel Group's consolidated returns for its taxable years 1999, 2001, and 2002. The Marvel Group claimed a CNOL carryforward of $47,424,026 into its taxable year ending December 31, 2003.

On March 28, 2013, respondent mailed to petitioner a notice of deficiency determining deficiencies for petitioner's taxable years 2003 and 2004 of $2,144,756 and $14,453,653, respectively. In the notice of deficiency respondent challenged the Marvel Group's computation of the CNOL carryforward and took the position that MEG Group should properly have reduced its $187,154,680 CNOL as of October 1, 1998, by $171,462,463, the total of excluded COD income for MEG, Fleer, Heroes, and Malibu. This reduction would have resulted in a remaining CNOL as of October 2, 1998, and carried into the Marvel Group subject to the limitations of section 382, of $15,692,217. Petitioner timely filed a petition disputing the determinations in the notice of deficiency.

## Discussion

Either party may move for summary judgment regarding all or any part of the legal issues in controversy. *See* Rule

_____

[3] This amount represents MEG Group's original $187,154,680 CNOL less $89,566,469 of total reduction of CNOL as of October 1, 1998. The CNOL carryforward was limited by sec. 382.

121(a). Summary judgment is intended to expedite litigation and to avoid unnecessary and expensive trials. *Shiosaki v. Commissioner*, 61 T.C. 861, 862 (1974). Summary judgment is appropriate where the pleadings and other materials show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. Rule 121(a) and (b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). The burden is on the moving party to demonstrate that no genuine dispute as to any material fact remains and that it is entitled to judgment as a matter of law. *FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74–75 (2001). In deciding whether to grant summary judgment the Court must consider the factual materials and inferences drawn from them in the light most favorable to the nonmoving party. *Bond v. Commissioner*, 100 T.C. 32, 36 (1993); *Naftel v. Commissioner*, 85 T.C. 527, 529 (1985). However, the nonmoving party is required "to go beyond the pleadings and by * * * [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Rauenhorst v. Commissioner*, 119 T.C. 157, 175 (2002); *FPL Grp., Inc. & Subs. v. Commissioner*, 115 T.C. 554, 559 (2000). Summary judgment is appropriate in the matter sub judice because the parties agree on all material facts and the only dispute we must resolve is one of law.

In MEG Group's short taxable year ending October 1, 1998, four of its consolidated group members realized total COD income of $171,462,463 resulting from bankruptcy filings under chapter 11. Each of the four MEG Group debtor members excluded the COD income from its respective gross incomes under section 108(a)(1)(A). MEG Group also had a $187,154,680 CNOL for its short taxable year ending October 1, 1998. Under section 108(b)(2)(A), MEG Group allocated a portion of the group's CNOL to each of the four MEG Group debtor members and reduced the allocated CNOL shares by each member's previously excluded COD income. As a result, MEG Group reduced its $187,154,680 CNOL by $89,566,469 of the $171,462,463 in excluded COD income.

The sole issue for decision is whether the NOL subject to reduction under section 108(b)(2)(A) is the entire CNOL of a

consolidated group (single-entity approach) or a portion of a consolidated group's CNOL allocable to each group member (separate-entity approach). Respondent argues that the "'NOL' that must be reduced under section 108 is the entire CNOL" of a consolidated group. According to respondent, "the MEG Group should properly have reduced its $187,154,680 CNOL as of October 1, 1998 by $171,462,463, the total of the excluded COD income for each of Fleer, Heroes, MEG and Malibu resulting in a remaining CNOL as of October 2, 1998 * * * of $15,692,217." Respondent concludes that this method of tax attribute reduction would have "result[ed] in $0 of CNOL carryover into the * * * [Marvel Group] consolidated return taxable years ending December 31, 2003 and December 31, 2004."

Petitioner argues that the NOL subject to reduction under section 108(b)(2)(A) is limited to the share of a consolidated group's CNOL allocable to each member entity. Specifically, petitioner asserts that "where a taxpayer that is a member of a consolidated group excluded COD income from gross income during a taxable year ended October 1, 1998 pursuant to section 108(a)(1)(A), the 'net operating loss' or 'net operating loss carryover' of the taxpayer that was subject to reduction under section 108(b)(2)(A) was the portion of the CNOL of the consolidated group attributable to such member."

## 1. *Preliminary Matter*

In the notice of deficiency respondent challenged MEG Group's use of the separate-entity approach and took the position that MEG Group should properly have reduced its $187,154,680 CNOL for its short taxable year ending October 1, 1998, by $171,462,463, the total of excluded COD income for the four MEG Group debtor members. The single-entity approach advocated by respondent would have resulted in a remaining CNOL of $15,692,217 for MEG Group following its short taxable year ending October 1, 1998. Although the notice of deficiency pertains to petitioner's 2003 and 2004 calendar tax years, the resolution of the instant matter depends on the appropriate method of tax attribute reduction used by MEG Group for its short taxable year ending October 1, 1998. Both parties agree that, if the separate-entity approach

is proper pursuant to section 108(b)(2)(A), petitioner is not liable for any income tax deficiencies for 2003 and 2004. On the other hand, the parties agree that if the single-entity approach is proper pursuant to section 108(b)(2)(A), petitioner is liable for the additional tax as set forth in the notice of deficiency.

Section 172(e) provides that "[i]n determining the amount of any net operating loss carryback or carryover to any taxable year, the necessary computations involving any other taxable year shall be made under the law applicable to such other taxable year." The law governing the instant matter is the law applicable for the year in which the COD income was excluded by MEG, Fleer, Heroes, and Malibu. *See Laney v. Commissioner*, T.C. Memo. 1997–403, 1997 Tax Ct. Memo LEXIS 484, at *32 ("[T]he nature and amount of the carryover item is determined and redetermined under the law in effect for the year in which the carryover item arose * * * rather than the year(s) to which the carryover item is carried."), *aff'd without published opinion*, 168 F.3d 482 (4th Cir. 1999). Accordingly, the resolution of this case will be based on the relevant law in effect for petitioner's short taxable year ending October 1, 1998.

2. *Applicable Law*

Section 61(a) generally defines gross income as "all income from whatever source derived". This includes income from the "discharge of indebtedness". Sec. 61(a)(12); *see also Gitlitz v. Commissioner*, 531 U.S. 206, 213 (2001). Section 108(a) provides certain exceptions to this general rule. One of these exceptions provides that COD income is excluded from the taxpayer's gross income if "the discharge occurs in a title 11 case".[4] Sec. 108(a)(1)(A). However, the price of exclusion is that certain of the taxpayer's favorable tax attributes must be reduced to the extent of the excluded COD income. Section 108(b) provides, in pertinent part:

> SEC. 108(b). REDUCTION OF TAX ATTRIBUTES.—
>
>   (1) IN GENERAL.—The amount excluded from gross income under subparagraph (A), (B), or (C) of subsection (a)(1) shall be applied to reduce the tax attributes of the taxpayer as provided in paragraph (2).

---

[4] Title 11 governs bankruptcy cases.

(2) TAX ATTRIBUTES AFFECTED; ORDER OF REDUCTION.—Except as provided in paragraph (5), the reduction referred to in paragraph (1) shall be made in the following tax attributes in the following order:
(A) NOL.—Any net operating loss for the taxable year of the discharge, and any net operating loss carryover to such taxable year.

Both parties agree that, pursuant to section 108(a)(1)(A), MEG, Fleer, Heroes, and Malibu correctly excluded their portions of $171,462,463 of COD income from their respective gross incomes for the short taxable year ending October 1, 1998. The parties also agree that MEG Group had a $187,154,680 CNOL for its short taxable year ending October 1, 1998. However, the parties disagree over what constitutes a taxpayer's NOL under section 108(b)(2)(A) when that taxpayer is a member of a consolidated group. Respondent contends that the NOL subject to reduction is the consolidated group's entire CNOL. Petitioner contends that the NOL subject to reduction is an allocable portion of CNOL attributable to each member of the consolidated group. Whether the NOL to be reduced under section 108(b)(2)(A) is the entire CNOL or an allocable portion of the CNOL is the sole issue for resolution in this case.

### 3. *United Dominion*

To resolve the issue in this case we must determine whether a consolidated group can allocate and apportion its CNOL to its consolidated group members so that each member can have a separate NOL subject to reduction under section 108. Respondent's primary position is that consolidated group members are prohibited from having separate NOLs unless specifically authorized to do so by a provision of the consolidated return regulations. Respondent asserts that "[t]he question of whether members of a consolidated group have separate NOLs was considered and decided by the Supreme Court in *United Dominion Indus., Inc. v. * * * [United States]*, 532 U.S. 822 (2001)". Petitioner contends that *United Dominion* "addressed an entirely different question than the issue before this Court, a question that had nothing to do with section 108."

*United Dominion* involved the appropriate method for calculating product liability losses (PLL) of an affiliated group of corporations that elected to file a consolidated return. For the years at issue in *United Dominion* (i.e., 1983–86), section

172 allowed PLLs to be carried back 10 years rather than the 3 years generally permitted for normal NOLs. A taxpayer's PLL was defined in section 172(j)(1) as the lesser of: (1) the taxpayer's NOL for the year and (2) the taxpayer's allowable deductions attributable to product liability expenses (PLE). In other words, a taxpayer's PLL was the total of its PLEs, limited to the amount of its NOL. *United Dominion*, 532 U.S. at 825.

The issue presented in *United Dominion* was how to calculate the PLL of a consolidated group eligible for the 10-year carryback under section 172. The Government argued that the PLL of a consolidated group member should be determined using a "'separate-member' approach" (i.e., comparing each group member's PLEs to that member's separate NOL). *Id.* at 828, 831. The Government proposed that a group member's negative separate taxable income should serve as a proxy for that member's separate NOL. *Id.* Pursuant to this approach, PLEs "incurred by an affiliate with positive separate taxable income cannot contribute to a PLL eligible for 10-year carryback." *Id.* at 828. Therefore, under the Government's methodology, the taxpayer would have been prevented from taking full advantage of certain group members' PLEs.

The taxpayer argued that the PLLs for a consolidated group should be determined using a "'single-entity' approach" (i.e., comparing the consolidated group's CNOL to the aggregate PLEs of the group members). *Id.* at 827. The single-entity approach benefited the taxpayer in *United Dominion* because its CNOL exceeded its aggregate PLEs in each of the years at issue, thus making all PLEs eligible for a 10-year carryback.

The Supreme Court began its opinion by rejecting the Government's argument that a consolidated group member's separate taxable income acts as a "surrogate" for a separate NOL, thereby allowing a group member's separate taxable income to be compared with its PLEs in order to determine a separate PLL.[5] *Id.* at 831–832. The Court explained por-

_____

[5] The Court explained that a consolidated group member's separate taxable income "excludes several items that an individual taxpayer would normally account for in computing income or loss, but which an affiliated group may tally only at the consolidated level, such as capital gains and losses, charitable-contribution deductions, and dividends-received deduc-

tions of the consolidated return regulations pertaining to consolidated taxable income and CNOL as follows:

Under Treas. Regs. §§ 1.1502–11(a) and 1.1502–21(f), an affiliated group's "consolidated taxable income" (CTI), or, alternatively, its "consolidated net operating loss" (CNOL), is determined by "taking into account" several items. The first is the "separate taxable income" (STI) of each group member. A member's STI (whether positive or negative) is computed as though the member were a separate corporation (i.e., by netting income and expenses), but subject to several important "modifications." Treas. Reg. § 1.1502–12. These modifications require a group member calculating its STI to disregard, among other items, its capital gains and losses, charitable-contribution deductions, and dividends-received deductions. *Ibid.* These excluded items are accounted for on a consolidated basis, that is, they are combined at the level of the group filing the single return, where deductions otherwise attributable to one member (say, for a charitable contribution) can offset income received by another (from a capital gain, for example). Treas. Regs. §§ 1.1502–11(a)(3) to (8); 1.1502–21(f)(2) to (6). A consolidated group's CTI or CNOL, therefore, is the sum of each member's STI, plus or minus a handful of items considered on a consolidated basis. [*United Dominion*, 532 U.S. at 826.]

The Supreme Court ultimately agreed with the taxpayer, holding (8 to 1) that a "group's product liability loss must be figured on a consolidated basis in the first instance, and not by aggregating product liability losses separately determined company by company." *Id.* at 824. In arriving at this conclusion the Court examined the consolidated return regulations and emphasized that "the Code and regulations governing affiliated groups of corporations filing consolidated returns provide only one definition of NOL: 'consolidated' NOL". *Id.* at 829. The Court also instructed that a generally applicable concept of a separate NOL in the consolidated return context "simply does not exist." *Id.* at 830.

The Court's analysis was as follows:

The first step in applying the definition and methodology of PLL to a taxpayer filing a consolidated return thus requires the calculation of NOL. As * * * [the taxpayer] correctly points out, the Code and regulations governing affiliated groups of corporations filing consolidated returns provide only one definition of NOL: "consolidated" NOL, see Treas. Reg. § 1.1502–21(f). There is no definition of separate NOL for a

_____

tions." *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 832 (2001). This causes a group member's separate taxable income to be inflated by eliminating certain deductions or deflated by eliminating certain items of income such as capital gains. *Id.*

member of an affiliated group. Indeed, the fact that Treasury Regulations do provide a measure of separate NOL in a different context, for an affiliated corporation as to any year in which it filed a separate return, *infra*, at 832–834, underscores the absence of such a measure for an affiliated corporation filing as a group member. Given this apparently exclusive definition of NOL as CNOL in the instance of affiliated entities with a consolidated return (and for reasons developed below, *infra*, at 834–838) we think it is fair to say, as * * * [the taxpayer] says, that the concept of separate NOL "simply does not exist." Brief for Petitioner 15. The exclusiveness of NOL at the consolidated level as CNOL is important here for the following reasons. The Code's authorization of consolidated group treatment contains no indication that for a consolidated group the essential relationship between NOL and PLL will differ from their relationship for a conventional corporate taxpayer. Nor does any Treasury Regulation purport to change the relationship in the consolidated context. If, then, the relationship is to remain essentially the same, the key to understanding it lies in the regulations' definition of net operating loss exclusively at the consolidated level. Working back from that, PLEs should be considered first in calculating CNOL, and they are: because any PLE of an affiliate affects the calculation of its STI, that same PLE necessarily affects the CTI or CNOL in exactly the same way, dollar for dollar. And because, by definition, there is no NOL measure for a consolidated return group or any affiliate except CNOL, PLEs cannot be compared with any NOL to produce PLL until CNOL has been calculated. Then, and only then in the case of the consolidated filer, can total PLEs be compared with a net operating loss. In sum, comparable treatment of PLL in the instances of the usual corporate taxpayer and group filing a consolidated return can be achieved only if the comparison of PLEs with a limiting loss amount occurs at the consolidated level after CNOL has been determined. This approach resting on comparable treatment has a further virtue entitled to some weight in case of doubt: it is (relatively) easy to understand and to apply. [*United Dominion*, 532 U.S. at 829–831; fn. ref. omitted.]

The Court also examined section 1.1502–79(a)(3), Income Tax Regs., which apportions a consolidated group's CNOL to members of the group for the purpose of carrying back losses to separate return years.[6] The Court acknowledged that section 1.1502–79(a)(3), Income Tax Regs., provides a close analogy for a separate member NOL but found that this

---

[6] Sec. 1.1502–79(a)(3), Income Tax Regs., is the precursor to sec. 1.1502–21(b)(2)(iv), Income Tax Regs., and allows for the allocation or apportionment of CNOL in limited circumstances. Under this regulation the amount of CNOL that is apportioned to a consolidated group member is the amount attributable to the member, which is the group's CNOL multiplied by a fraction. The numerator of the fraction is the separate NOL of the member, and the denominator is the sum of the separate NOLs of all group members in such year having such losses.

regulation applies only narrowly to determine carryback and carryforward NOLs to separate return years in which the member was not part of the consolidated group. The Court reasoned that, because no carrybacks to separate return years were at issue, section 1.1502–79(a)(3), Income Tax Regs., was inapplicable in calculating the taxpayer's PLL using the separate-entity approach. *Id.* at 833. In describing the inapplicability of the apportionment rules, the Court stated that section 1.1502–79(a)(3), Income Tax Regs., "unbakes the cake for only one reason, and that reason has no application here." *Id.*

Petitioner's argument that *United Dominion* addresses an issue distinctly different from tax attribute reduction under section 108 fails to recognize that the Supreme Court's decision concerning the proper computation of a consolidated group's PLL could only have been reached by first determining whether members of a consolidated group have separate NOLs. We agree with petitioner that *United Dominion* concerned the application of PLL carryback rules in the consolidated group context. However, a central prerequisite to the Supreme Court's decision in *United Dominion* was the legal determination of whether separate NOLs exist for consolidated group members where no specific rule provides authority for NOL computation on a separate-entity basis.

Despite the fact that the matter currently before the Court involves the application of section 108(b)(2)(A)—rather than section 172—the critical issue is identical to that in *United Dominion*: whether the pre-2003 consolidated return regulations allow for the separate-entity approach. The Supreme Court in *United Dominion* concluded that a consolidated group member cannot have a separate NOL for a consolidated return year unless a specific consolidated return regulation allocates and apportions part of the CNOL to that member. No such regulation existed for petitioner's short taxable year ending October 1, 1998, and therefore the proper NOL subject to reduction under section 108(b)(2)(A) is petitioner's CNOL. In applying the Supreme Court's holding in *United Dominion* to the matter currently before us, we conclude that the NOL subject to reduction under section 108(b)(2)(A) for petitioner's short tax year ending October 1, 1998, is the consolidated group's CNOL.

4. *Petitioner's Arguments*

a. *Statutory Language*

Despite our conclusion above that *United Dominion* is dispositive in the instant matter, we nonetheless will address petitioner's remaining arguments. Petitioner argues that the "clear and unambiguous" language of section 108 pertains exclusively to the individual members of a consolidated group. According to petitioner, the words "the taxpayer" in both section 108(b)(1) and (2) "refer only to the debtor member [of a consolidated group] that has excluded COD income as a result of that member's bankruptcy." Petitioner therefore reasons that "the tax attributes" subject to reduction under section 108(b)(2)(A) cannot include the CNOL of the entire affiliated group because "the CNOL is not an attribute belonging to an individual member of a consolidated group, and thus cannot be what is reduced under section 108(b)."

Respondent does not dispute that "the statutory language appears to have been written with stand-alone companies in mind." However, respondent contends that "this is a common statutory construct, because Congress delegated authority to the Secretary to promulgate regulations that would make the adjustments necessary to apply general Code provisions to groups filing consolidated returns."

When the relevant statutory language is clear and unambiguous and the statutory scheme is coherent and consistent, the Court's function is to apply the statute as written and according to its terms. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *Fernandez v. Commissioner*, 114 T.C. 324, 329–330 (2000). The statute must be read as a whole, and the meaning of a particular portion of a statutory provision must be determined with reference to its context. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). If a statute is ambiguous or silent, we may look to the statute's legislative history in an attempt to determine congressional intent. *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987); *Fernandez v. Commissioner*, 114 T.C. at 329–330.

Section 108(a)(1)(A) provides, in pertinent part, that "[g]ross income does not include any amount which (but for this subsection) would be includible in gross income by rea-

son of the discharge (in whole or in part) of indebtedness of *the taxpayer* if * * * the discharge occurs in a title 11 case". (Emphasis added.) Section 108(b)(1) further provides that "[t]he amount excluded from gross income * * * shall be applied to reduce *the tax attributes of the taxpayer*". (Emphasis added.) Absent an election under section 108(b)(5),[7] the taxpayer must first reduce "[a]ny net operating loss for the taxable year of the discharge, and any net operating loss carryover to such taxable year." Sec. 108(b)(2)(A). Because MEG Group did not make an election under section 108(b)(5), the first tax attributes subject to reduction are MEG Group's current year and carryover NOLs.

Ordinarily, a corporation that is not a member of a consolidated group computes its NOL on a stand-alone basis. Thus, where a corporation with excluded COD income is not a member of a consolidated group, the NOL to be reduced is clear. However, section 108 does not lend this degree of clarity to the consolidated return scenario. Although we agree with the parties that section 108 appears to have been written in contemplation of stand-alone entities, nowhere does the statute specifically define "the taxpayer" as either a member entity of a consolidated group or the consolidated group as a whole. Furthermore, section 108 does not articulate whether the "tax attributes" subject to reduction are those at the consolidated level or are those allocable to each member entity.

Although the legislative history of section 108(b) does not include any specific indication of legislative intent concerning the application of section 108(b)(2)(A) to consolidated groups, it does provide insight into the general purpose of section 108(b). The report of the Senate Committee on Finance states that section 108 is

> intended to carry out the Congressional intent of deferring, but eventually collecting within a reasonable period, tax on ordinary income realized from debt discharge. Thus in the case of a bankrupt or insolvent debtor, the debt discharge amount is applied to reduce the taxpayer's net operating losses and certain other tax attributes, unless the taxpayer

---

[7] A taxpayer can elect to reduce the basis of any depreciable property by the amount of debt discharged before reducing the amounts of any other tax attributes. Sec. 108(b)(5). MEG Group did not make such an election.

elects to apply the amount first to reduce basis in depreciable assets. * * * [S. Rept. No. 96–1035, at 10–11 (1980), 1980–2 C.B. 620, 625.]

In a notice of proposed rulemaking, the Department of the Treasury succinctly summarized this legislative history as follows:

> The legislative history of the Bankruptcy Tax Act states that the exclusion of discharge of indebtedness (COD income) from gross income under section 108 is intended to promote a debtor's fresh start. S. Rep. No. 1035, 96th Cong., 2d Sess. 10 (1980), 1980–2 C.B. 620, 624; H.R. Rep. No. 833, 96th Cong., 2d Sess. 11 (1980). The exclusion provided by the statute generally operates, however, to defer, rather than eliminate, income from discharge of indebtedness. [62 Fed. Reg. 955, 956 (Jan. 7, 1997).]

To minimize the potential for permanent exclusion, a consolidated group member that excludes COD income must reduce tax attributes which would otherwise be available to offset its income. A consolidated group's CNOL is a favorable tax attribute that consolidated group members share. In order for the legislative objective of deferral to be accomplished while the group is intact, attribute reduction must be applied to the CNOL as a whole and not some lesser portion deemed attributable to the debtor member. MEG Group's apportionment of its CNOL to its consolidated group members for purposes of section 108(b) attribute reduction produced a result that was inconsistent with the intent of Congress to defer, rather than permanently eliminate, COD income. Thus, our decision that *United Dominion* prohibits the separate-entity approach for petitioner's short taxable year ending October 1, 1998, comports with Congress' intention that COD income be deferred rather than eliminated wholesale.

b. *Section 1017 Argument*

Petitioner also argues that section 1017[8] is evidence that Congress intended for consolidated groups to use the separate-entity approach under section 108(b)(2)(A). Section 1017(b)(3)(D) provides a special rule for reducing asset basis under section 108 in the case of an affiliated group, providing a lookthrough rule that allows for basis reduction when a member of a consolidated group holds stock in a subsidiary.

---

[8] Sec. 1017 is cross-referenced in sec. 108(b)(2)(E)(ii).

Petitioner argues that section 1017 demonstrates that Congress was cognizant of the application of section 108 in the consolidated group context and provided specific rules for consolidated groups where the default separate-entity approach was not intended. Because there is no similar Code provision detailing NOL reduction for consolidated groups under section 108(b)(2)(A), petitioner concludes that Congress intended for the separate-entity approach to apply.

We disagree with petitioner's argument for the following reasons. First, as previously discussed, the plain language of section 108 does not demonstrate that Congress intended the application of the separate-entity approach as a default rule for tax attribute reduction. Second, the fact that Congress enacted a special rule for consolidated groups in section 1017(b)(3)(D) is not instructive as to what it intended under section 108(b)(2)(A). In our view, a more plausible explanation for the enactment of section 1017(b)(3)(D) was Congress' desire to provide specific and immediate relief for consolidated groups in this narrow context. Accordingly, we will refrain from inferring congressional intent based on the mere absence in section 108(b)(2)(A) of a rule corollary to section 1017(b)(3)(D).

c. *Consolidated Return Regulations*

The law applicable to MEG Group's 1998 tax attribute reduction also includes the consolidated return regulations in effect at that time. *See* sec. 1502 (providing that the Secretary shall prescribe regulations that are necessary to determine consolidated groups' tax liabilities). Petitioner argues that these consolidated return regulations "require the determination of an individual member's share of the consolidated group's CNOL."

The Code applies to a consolidated group to the extent that the consolidated return regulations do not provide otherwise. Sec. 1.1502–80(a), Income Tax Regs. A consolidated group member's gross income and deductions for a consolidated return year are included in the computation of the entire group's consolidated taxable income or CNOL. Secs. 1.1502–11(a), 1.1502–12, Income Tax Regs.; sec. 1.1502–21T(e), Temporary Income Tax Regs., 61 Fed. Reg. 33333 (June 27, 1996). Section 1.1502–21T(b)(2), Temporary Income Tax

Regs., 61 Fed. Reg. 33328 (June 27, 1996), [9] provides that, when a member of a consolidated group leaves the group, a portion of the group's CNOL is allocated to the departing member. In addition, section 1.1502–21T(b)(2), Temporary Income Tax Regs., *supra*, applies to apportion a consolidated group's CNOL to group members in certain circumstances in order to carry back losses to pre-consolidated-return years.

For COD income discharged after August 29, 2003, section 1.1502–28T, Temporary Income Tax Regs., 68 Fed. Reg. 69025 (Dec. 11, 2003), prescribes a hybrid approach that first reduces the tax attributes of the member entity, then applies a lookthrough rule to reduce attributes of the member entity's subsidiaries, and lastly reduces attributes of the consolidated group. With slight modifications, this temporary regulation was adopted as final and effective for COD income discharged after March 21, 2005. Sec. 1.1502–28(d), Income Tax Regs. [10]

Petitioner's argument that the pre-2003 consolidated return regulations allow for the separate-entity approach under section 108(b)(2)(A) is without merit. The matter sub judice involves MEG Group's tax year ending October 1, 1998, which is before the Commissioner's issuance of section 1.1502–28T, Temporary Income Tax Regs., *supra*, or the adoption of section 1.1502–28, Income Tax Regs. The pre-2003 consolidated return regulations did not specifically articulate how a consolidated group should reduce its tax attributes under section 108(b). However, as previously discussed, the Supreme Court in *United Dominion Indus., Inc. v. Commissioner*, 532 U.S. 822 (2001), found that the pre-2003 consolidated return regulations did in fact prohibit the

---

[9] Sec. 1.1502–21T, Temporary Income Tax Regs., 61 Fed. Reg. 33328 (June 27, 1996), was a temporary regulation in petitioner's short taxable year ending October 1, 1998.

[10] These post-*United Dominion* regulations appear to follow the invitation of the Supreme Court:

Thus, it is true, as the Government has argued, that "[t]he Internal Revenue Code vests ample authority in the Treasury to adopt consolidated return regulations to effect a binding resolution of the question presented in this case." Brief for United States 19–20. To the extent that the Government has exercised that authority, its actions point to the single-entity approach as the better answer. To the extent the Government disagrees, it may amend its regulations to provide for a different one. [*United Dominion*, 532 U.S. at 838.]

allocation of separate NOLs for consolidated group members unless it was within the ambit of a specific regulatory provision. For this reason, we are not persuaded by petitioner's argument to the contrary.

### d. *Temple-Inland*

In an attempt to bolster its position that *United Dominion* has no significance with respect to attribute reduction under section 108, petitioner cites *Temple-Inland, Inc. v. United States*, 68 Fed. Cl. 561 (2005). *Temple-Inland* involved damages resulting from the Government's breach of a thrift acquisition agreement under which a consolidated group acquired three failing thrifts. *Id.* at 562–563. Among the damages were the values of lost income tax deductions caused by the Government's enactment of legislation that eliminated the tax benefits associated with the thrift acquisition agreement. *Id.* at 563. After an examination of the consolidated group's tax returns for the years at issue, the taxpayer and the Internal Revenue Service (IRS) entered into a closing agreement which included agreed-upon amounts for the taxpayer's bad debt deductions for the taxable years 1991 and 1992. *Id.* at 563, 568.

Following the execution of the closing agreement, the Government disagreed with the taxpayer's computation of the deductions. *Id.* at 564–565. The Government argued that the group's consolidated tax attributes should have been reduced under section 108(b). *Id.* at 569. The U.S. Court of Federal Claims held for the taxpayer, ruling that the closing agreement between the IRS and the taxpayer specifically provided that tax attribute reduction would be limited to the tax attributes that were generated by the insolvent consolidated group members. *Id.* at 569.

Although the *Temple-Inland* court made its determination on the basis of the closing agreement, the court included a footnote stating: "*United Dominion* dealt with the carryback period for product liability losses under section 172(b) and has nothing to do with [s]ection 108." *Id.* at 569 n.5. Petitioner emphasizes this footnote to support the proposition that *United Dominion* is "narrow in scope" and "ha[s] no significance with respect to section 108."

Petitioner's reliance on a footnote in *Temple-Inland* is misplaced. *Temple-Inland* does not address the central issue of

whether a CNOL can be apportioned among consolidated group members absent a rule in the consolidated return regulations allowing for such apportionment. The holding of *Temple-Inland* is based on the finality of the closing agreement between the IRS and the taxpayer and has nothing to do with the application of section 108(b)(2)(A) to a member of a consolidated group. For this reason we are unpersuaded by petitioner's argument that *Temple-Inland* limits the application of *United Dominion* to section 172.

### e. *Gottesman*

Petitioner alternatively contends that its application of the separate-entity approach should prevail because the method was reasonable under existing law when its consolidated tax return was filed for 1998. Petitioner cites *Gottesman & Co. v. Commissioner*, 77 T.C. 1149 (1981), in support of the proposition that a taxpayer's reasonable interpretation will be upheld where the Secretary has failed to issue sufficient guidance under the consolidated return regulations. As evidence that the separate-entity approach to attribute reduction was "reasonable under the circumstances" before *United Dominion*—and thus, analogous to *Gottesman*—petitioner cites multiple IRS private letter rulings.

In *Gottesman* the issue was whether the regulations promulgated by the Secretary under section 1502 required accumulated taxable income for section 531 purposes to be calculated on a separate company basis or on a consolidated basis. *Id.* at 1149–1150. Before 1966 affiliated corporations filing consolidated returns were required by the regulations to compute their accumulated taxable income on a combined basis for section 531 purposes. *Id.* at 1152–1153. The 1966 regulations were silent on the issue. *Id.* at 1153–1155. The Secretary proposed regulations requiring computation on a combined basis in 1968, withdrew the proposed regulations in 1971 without explanation, and did not issue new proposed regulations until 1979. *Id.* at 1155.

We addressed whether it was proper for the taxpayer to apply a separate company method for the taxpayer's 1973–75 tax years. *Id.* at 1157–1158. In holding for the taxpayer, we stated:

> We cannot fault * * * [the taxpayer] for not knowing what the law was in this area when the Commissioner, charged by Congress to announce the law (sec. 1502), never decided what it was himself * * *
> Thus, we find that the Commissioner's regulations regarding the manner in which the accumulated earnings tax was to be imposed on corporations making consolidated returns were ambiguous during the years at issue. This ambiguity was of the Commissioner's making, and, as such, must be held against him * * * [The taxpayer's] interpretation of these regulations was reasonable under the circumstances. * * *
> [*Id.*]

In *Gottesman* we upheld the taxpayer's interpretation of the consolidated return regulations as "reasonable under the circumstances" because of an "ambiguity" in the existing law. The ambiguity in the applicable regulations had not been resolved by the Supreme Court when *Gottesman* was decided. However, the Supreme Court in *United Dominion*, 532 U.S. at 834, "expressly and exclusively defin[ed] NOL as CNOL" in the consolidated return context. The fact that *United Dominion* was decided in 2001 whereas the relevant year for purposes of determining the application of section 108 and the meaning of NOL is 1998 is of no consequence because Supreme Court opinions generally "must be given full retroactive effect". *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."); *Hawknet, Ltd. v. Overseas Shipping Agencies*, 590 F.3d 87, 91 (2d Cir. 2009) (citing *Harper*, 509 U.S. at 97); *Miller v. Commissioner*, T.C. Memo. 2001–55, 2001 Tax Ct. Memo LEXIS 65, at *14 ("When the U.S. Supreme Court announces a rule of law and applies it to the litigants in the case announcing the rule, that rule applies retroactively to all other pending cases unless barred by the statute of limitations or res judicata.").

The issue in the current case, which was central to the opinion of the Supreme Court in *United Dominion*, is identifying the appropriate NOL in the consolidated return context. Although we acknowledge that petitioner's application of the separate-entity approach in filing its 1998 consolidated tax return was plausible at the time, it is contrary to the rule in the consolidated return regulations as interpreted by the

Supreme Court in *United Dominion*. Petitioner's application of the separate-entity approach for purposes of defining NOL not only conflicts with the binding precedent of *United Dominion*, but also is the approach specifically rejected by the Supreme Court in that case. Because *United Dominion* clarified that a separate NOL does not exist in the consolidated return regulations, there is no remaining ambiguity as to this issue for petitioner's consolidated return for the short taxable year ending October 1, 1998. Therefore *Gottesman* is inapplicable to the current case.

Regarding petitioner's argument concerning the IRS' pre-*United Dominion* determinations advocating the separate-entity approach, section 6110(k)(3) explicitly provides that the IRS' written determinations are not precedential. We also note that the private letter rulings and written determinations that petitioner cited were issued before the Government's position in *United Dominion* was rejected by the Supreme Court.

In conclusion, we find that respondent correctly applied section 108(b)(2)(A) in accordance with the Supreme Court's opinion in *United Dominion*. Neither the Code nor the applicable consolidated return regulations provide authority for an affiliated group to allocate and apportion CNOL to consolidated group members for purposes of reducing tax attributes pursuant to section 108(b)(2)(A). We hold that for the relevant consolidated return years in issue the consolidated return regulations required that a consolidated group's entire CNOL be treated as the NOL subject to reduction.

In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

> *An appropriate order and decision will be entered granting respondent's motion for summary judgment and denying petitioner's motion for summary judgment.*